# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **IN RE FORCE PROTECTION, INC. SECURITIES LITIGATION** | Consolidated Civil Action No. 2:08-cv-845-CWH |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**DUFFY & YOUNG, LLC**
Brian C. Duffy (Fed. Bar # 9491)
J. Rutledge Young III (Fed. Bar # 7260)
96 Broad Street
Charleston, South Carolina 29401
Telephone:  (843) 720-2044
Facsimile:  (843) 720-2047
bduffy@duffyandyoung.com
ryoung@duffyandyoung.com

*Liaison Counsel*

**BERMAN DeVALERIO**
Norman Berman, Esq.
Jeffrey C. Block, Esq.
Kristin J. Moody, Esq.
Autumn W. Smith, Esq.
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194
nberman@bermandevalerio.com
jblock@bermandevalerio.com
kmoody@bermandevalerio.com
asmith@bermandevalerio.com

**POMERANTZ HAUDEK GROSSMAN & GROSS LLP**
Marc I. Gross, Esq.
Jason S. Cowart, Esq.
R. James Hodgson, Esq.
100 Park Avenue
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
migross@pomlaw.com
jscowart@pomlaw.com
rjhodgson@pomlaw.com

*Co-Lead Counsel for the Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

I.  STATEMENT OF FACTS .......................................................................... 3

    A.  False Statements Concerning The Company's
    Receipt Of Adverse Reports From The DOD ....................................... 3

    B.  False Financial Statements During The Class Period ......................... 6

    C.  Revelations ............................................................................................ 7

    D.  Defendants McGilton And Kavanaugh Traded On Material,
    Non-Public Information ......................................................................... 9

II.  ARGUMENT ............................................................................................. 9

    A.  The Class Should Be Certified ............................................................ 9

        1.  This Action Satisfies The Standards For Class
        Certification Under Fed. R. Civ. P. 23(a) ................................. 11

            a)  The Class Is So Numerous That Joinder
            Of All Members Is Impracticable ................................... 11

            b)  Questions Of Law And Fact Are Common
            And Lead Plaintiffs' Claims Are Typical ...................... 12

            c)  Lead Plaintiffs Will Fairly And Adequately Represent The Class ........... 13

        2.  The Conditions Of Rule 23(b)(3) Are Satisfied By The Proposed Class ......... 15

            a)  Common Questions Of Law Or Fact Predominate ................................... 16

               (i)  Whether Defendants Made, Or Controlled Those Who Made,
               False Statements With Scienter Is A Common Question ................... 17

               (ii)  Reliance-Related Issues Will Be Resolved On A Common Basis ....... 17

               (iii)  Lead Plaintiffs Will Prove Damage-Related Issues
               On A Class-Wide Basis ............................................... 20

            b)  A Class Action Is Superior To Other Available Methods
            For The Fair And Efficient Adjudication Of This Action ......................... 22

    B.  The Sub-Class Should Also Be Certified ........................................... 25

CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................22

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997).................................................................................16

*Austell v. Smith*,
   634 F. Supp. 326 (W.D.N.C. 1986) ...........................................................23

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...........................................................................17, 18

*In re BearingPoint, Inc. Sec. Litig.*,
   232 F.R.D. 534 (E.D. Va. 2006) ........................................9, 10, 11, 12, 14, 16

*In re Cooper Cos. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009) ..............................................................22

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2004).............................................................25

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)................................................................................10

*Friedland v. Coastal Healthcare Group*,
   1996 U.S. Dist. LEXIS 16088 (M.D.N.C. Sept. 12, 1996).........................12

*Gariety v. Grant Thornton, LLP*,
   368 F.3d 356 (4th Cir. 2004) .......................................................10, 18, 19

*Gen. Tel. Co. of the Southwest v. Falcon*,
   457 U.S. 147 (1982).................................................................................12

*In re Kirschner Med. Corp. Sec. Litig.*,
   139 F.R.D. 74 (D. Md. 1991)...............................................10, 13, 14, 24

*In re LDK Solar Sec. Litig.*,
   255 F.R.D. 519 (N.D. Cal. 2009)..............................................................22

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ..............................................................22

*In re Micron Tech., Inc. Sec. Litig.*,
   247 F.R.D. 627 (D. Idaho 2007) ................................................................22

*In re Microstrategy Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................26

*Miller v. Asensio & Co.*,
   364 F.3d 223 (4th Cir. 2004) ....................................................................20

*In re Mills Corp. Sec. Litig.*,
   257 F.R.D. 101 (E.D. Va. 2009) .........................................................16, 22

*Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) ..............................................................21, 22

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).................................................................................24

*In re Red Hat, Inc. Sec. Litig.*,
   2009 U.S. Dist. LEXIS 93493 (E.D.N.C. Aug. 28, 2009) ....................9, 16, 17, 18, 22

*Ross v. Abercrombie & Fitch Co.*,
   2008 U.S. Dist. LEXIS 74538 (S.D. Ohio 2008).......................................22

*Simpson v. Specialty Retail Concepts*,
   149 F.R.D. 94 (M.D.N.C. 1993) .........................................10, 13, 14, 23, 24

*South Carolina Nat'l Bank v. Stone*,
   139 F.R.D. 325 (D.S.C. 1991) ........................................................10, 16, 23

*In re Southeast Hotel Prop. Ltd. P'ship Investor Litig.*,
   151 F.R.D. 597 (W.D.N.C. 1993)....................................................10, 12, 22

*In re Tyco Int'l, Ltd.*,
   236 F.R.D. 62 (D.N.H. 2006) ...................................................................22

## STATUTES

Fed. R. Civ. P. 23(a) ................................................................ *passim*

iii

## PRELIMINARY STATEMENT

Courts in the Fourth Circuit have repeatedly found that securities fraud lawsuits are ideally suited for class treatment because they typically concern questions easily proven on a class-wide basis:  did a public company and its most senior executives knowingly or recklessly issue false and misleading statements; did those statements artificially inflate the price of the company's securities; and did investors suffer a loss that was caused by those statements.  This case is a prototypical securities class action, and is thus equally entitled to class action treatment.

The Consolidated Class Action Complaint ("CC") alleges that defendant Force Protection, Inc. ("Force Protection" or the "Company") and defendants Frank Kavanaugh, Gordon R. McGilton, Michael S. Durski, and Raymond W. Pollard (collectively, the "Individual Defendants") concealed from investors material facts concerning reports the Company received from the Department of Defense ("DOD") regarding its performance as a government contractor. By doing so, Defendants rendered misleading the Company's statements about its relationship with the DOD and compliance with applicable regulations, and falsely asserted that the Company had effective internal accounting controls and was profitable.  The issuance of these false statements and material omissions caused the price of Force Protection's stock to trade at artificially inflated prices.  Moreover, Kavanaugh and McGilton reaped approximately $87 million from this inflation when they sold personal holdings in the Company's stock while in possession of material, non-public information.  Investors suffered significant losses when the truth was revealed.

On the basis of these allegations, Lead Plaintiffs seek to bring class claims against all defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder; against the Individual Defendants pursuant to

Section 20(a) of the Exchange Act; and against defendants McGilton and Kavanaugh under Section 20A of the Exchange Act.

All of these allegations can be proven on a class-wide basis. Indeed, the four prerequisites for certification under Rule 23(a) – (1) that the proposed class be sufficiently numerous to make joinder impracticable; (2) that there be questions of law or fact that are common to all class members; (3) that the claims of the representative plaintiffs are typical of those of the class; and (4) that the representative plaintiff will fairly and adequately protect the interests of the class – are easily met.

Moreover, this action satisfies the two core requirements for certification under Rule 23(b)(3). First, there is no concern that individual issues will predominate over common issues. Moreover, there is no more fair or efficient way of adjudicating this controversy; indeed, if certification is denied, class members will effectively be deprived of any way to vindicate their rights.

The class sought is as follows:

All persons or entities who purchased Force Protection common stock on the open market during the period from January 18, 2007 through March 14, 2008, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b), 20(a), and 20A of the Securities Exchange Act (the "Class"). Excluded from the Class are Force Protection, Frank Kavanaugh, Gordon R. McGilton, Michael S. Durski, and Raymond W. Pollard (collectively, "Defendants"); any entity in which Defendants or any excluded person has or had a controlling interest; the officers and directors of Force Protection; and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

Lead Plaintiffs also seek certification of the following sub-class, in order to pursue the Section 20A claims:

All persons or entities who purchased Force Protection common stock on the open market contemporaneously with the sale of such securities by defendants Kavanaugh and/or McGilton, *i.e.*, sales on the following dates in 2007: January 24, January 25, January 26, April 24, April 25, April 26, May 14,

May 15, May 21, May 22, May 23, May 30, and May 31 (the "Sub-Class"). Excluded from the Sub-Class are Defendants; any entity in which Defendants or any excluded person has or had a controlling interest; the officers and directors of Force Protection; and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

Lead Plaintiffs further seek appointment of themselves as class representatives and the law firms of Berman DeValerio and Pomerantz Haudek Grossman & Gross LLP as counsel for the Class and Sub-Class ("Lead Counsel").

## I.    STATEMENT OF FACTS

### A.    False Statements Concerning The Company's Receipt Of Adverse Reports From The DOD

At all relevant times, Force Protection's business was dependent upon orders from its "primary" customer, the United States military. (¶ 23; Duffy Decl. Ex. 1 at 4.)[1] In 2006, the Company became the dominant supplier of MRAPs[2] to the military. (¶¶ 11, 42-43; Def. Mem. at 1.)[3] That year, the Company was awarded over $300 million in sole-source MRAP contracts (*see generally* Duffy Decl. Ex. 2) and saw its reported net income rise from a $13.5 million loss in 2005 to an $18.2 million profit in 2006. (Duffy Decl. Ex. 3 at 23.) At the same time, the Company expanded its workforce dramatically. (Def. Mem. at 23.)

---

[1] Citations to the CC are referred to herein as "¶ __." Citations to exhibits attached to the Declaration of Brian C. Duffy, Esq. in Support of Lead Plaintiffs' Motion for Class Certification are referred to herein as "Duffy Decl. Ex. __ at __." Note that numerous exhibits to the Duffy Decl. are excerpts of Force Protection filings with the United States Securities and Exchange Commission (the "SEC"). Lead Plaintiffs have provided the Court with only the relevant excerpts of these filings in the interest of clarity and brevity. If the Court wishes, Lead Plaintiffs will supplement their submission with complete versions of these abbreviated SEC filings.

[2] An MRAP is a Mine Resistant Armored Protection vehicle, Force Protection's chief product.

[3] Citations to the Memorandum of Law in Support of Defendants' Motion to Dismiss are referred to herein as "Def. Mem. at __."

From late 2006 through November 2007, Defendants misled the market into believing that the Company was well positioned to benefit from the large number of new contract awards the DOD was going to make in 2007. On November 14, 2006, for example, Defendants asserted with respect to contracts from the DOD that "[w]e have no reason to believe that such additional orders will not be forthcoming. . . ." (Duffy Decl. Ex. 4 at 26.) This statement, coupled with the Company's disclosure on December 1, 2006 that the DOD was going to award $10 billion in MRAP awards in 2007 (Duffy Decl. Ex. 5 at 1), led analysts to conclude that Force Protection was "best positioned to win the majority" of this business and "best positioned to benefit from this funding." (CC at ¶ 91; Duffy Decl. Ex. 6 at 4, Ex. 7 at 1.)

Defendants bolstered the market's confidence in the Company's ability to win a large percentage of these new contract awards on March 16, 2007, when they falsely stated that "[w]e believe that we maintain all requisite licenses and permits and are in compliance with all applicable federal, state, local and foreign regulations. . . ." (Duffy Decl. Ex. 8 at 8.) They similarly misled the market on May 15 and August 9, 2007, when they asserted that "we currently do not have any reason to expect that our customers will choose to stop buying our vehicles or that any significant contracts will be cancelled." (Duffy Decl. Ex. 9 at 20, Ex. 10 at 21.) The market took heed of these statements. On May 16, 2007, for example, one analyst predicted that Force Protection would win "37.7% of the 4,100 vehicles expected to be ordered in 2007." (Duffy Decl. Ex. 11 at 2.)

What the market did not know, however, and what Defendants affirmatively concealed, was that a large percentage of the vehicles the Company delivered to the DOD in 2006 were late, in violation of DOD regulations. (Duffy Decl. Ex. 2 at 20-21, 22 (Table 4).) Defendants similarly hid the fact that from May 2004 through October 2007 Force Protection received at

least *eight* reports from the DOD that were highly critical of the Company's finances and internal controls, that identified various regulatory breaches, and that questioned Force Protection's ability to perform government contracts. As the Company belatedly revealed on November 14, 2007 in its Form 10-Q that it filed with the SEC:

> The DCAA has issued audit reports that have been highly critical of our finances and financial accounting system, that have questioned our ability to perform our government contracts, and that have questioned or disallowed significant proposed charges under some of our government contracts.

> \*    \*    \*

> The DCAA has issued at least eight audit reports on our operations and contracts from May of 2004 through October of 2007.

> \*    \*    \*

> An adverse finding under a DCAA audit could result in the disallowance of our costs under a U.S. government contract, termination of U.S. government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. . . . Therefore, an unfavorable outcome to an audit by the DCAA or another government agency *could materially adversely affect our competitive position and result in a substantial reduction of our revenues.*

(Duffy Decl. Ex. 12 at 43 (emphasis added).)

In fact, what Force Protection revealed on November 14, 2007 as a mere contingency – that an adverse DCAA audit "could materially affect [its] competitive position and result in a substantial reduction of [its] revenues" (*id.*) – had already come to pass. Beginning in May 2007, although the DOD did in fact award billions of dollars in new MRAP contracts, Force Protection received only a small percentage of these awards. (*See infra* Part I.C.) Force Protection's stock price fell on the revelations that it would receive only small amounts of DOD business to build MRAPs, in stark contrast to the expectations of stock market analysts and the market as a whole. (*Id.*) Defendants misled investors by concealing the Company's history of late deliveries and the adverse DCAA and other DOD reports the Company had received, and by

falsely telling investors that the Company had no reason to believe additional orders would not be forthcoming.  (*Id.*)

### B.    False Financial Statements During The Class Period

During the Class Period, Force Protection filed its quarterly reports with the SEC on Form 10-Q for the first, second, and third quarters of 2007.   Defendants asserted that the financial statements contained in these reports were prepared in compliance with GAAP and, with respect to the first and second quarters, that the Company's systems of internal controls were effective.  (Duffy Decl. Ex. 13 at 16, 22; Duffy Decl. Ex. 14 at 17, 23; Duffy Decl. Ex. 15 at 28-29.)   Defendants recklessly ignored, however, issues raised during internal executive meetings (¶ 52) and in the DOD reports (Duffy Decl. Ex. 12 at 43) that indicated that the Company's internal accounting controls were deficient and completely incapable of ensuring that the Company's reported financial results were accurate.

For the first nine months of 2007, Force Protection reported earnings of approximately $23.5 million.  (Duffy Decl. Ex. 15 at 1.)  On September 15, 2008, the Company acknowledged that this figure was inaccurate, and in fact, that the Company suffered a loss of $616,000 during that period.   (Duffy Decl. Ex. 16 at 71.)   It also acknowledged that, throughout 2007, the Company had "material weaknesses" related to:   "Financial Statements Closing Process"; "Accounting for Inventory and related accounts"; "Accounting for revenue recognition"; "Accounting for income taxes"; "Inadequate monitoring of non-routine and non-systematic transactions"; and "Information Technology Controls."   (Duffy Decl. Ex. 16 at 133-35.)   In particular, the Company admitted that it had an "insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of GAAP."  (*Id.* at 134.)

### C.    Revelations

Investors received the first hint that the Company was not well positioned to receive a significant amount of the DOD's new MRAP orders when, after the market closed on May 30, 2007, the DOD announced that it was awarding Force Protection's rival, Navistar, a $623 million contract to build 1,200 MRAPs.  (Duffy Decl. Ex. 17.)  Force Protection received a token $11.99 million contract to build just 14 vehicles.  (Duffy Decl. Ex. 18.)  This news caused the Company's stock price to fall from $30.27 per share at the close of trading on May 30, 2007 to $28.47 per share at the close of trading on May 31, 2007.  (Duffy Decl. Ex. 19.)

Thereafter, on June 4, 2007, the Stanford Group issued an analyst report that projected that the Company would lose out to rivals for the next set of MRAP orders.  Force Protection stock plummeted further, from $27.42 per share at the close of trading on June 1, 2007, to $24.43 per share at the close of trading on June 4, 2007.  (Duffy Decl. Ex. 20.)

Subsequently, after the close of the market on July 11, 2007, Bloomberg Business News carried a news story that disclosed details of a report by the DOD Inspector General that was highly critical of Force Protection's delivery record.  (Duffy Decl. Ex. 21.)  According to this article, the Inspector General concluded that "the company did not perform as a reasonable contractor and failed to meet contractual delivery schedules."  (*Id.*)  Two days later, on July 13, 2007, Bloomberg reported that Armor Holdings, which was in the process of being acquired by BAE Systems, had won another, even larger, MRAP award of $518.5 million.  (Duffy Decl. Ex. 22.)  Force Protection shares, which closed at $22.89 per share on July 13, 2007, fell to $20.14 per share on July 16, 2007 (the market was closed on July 14 and 15).  (Duffy Decl. Ex. 23.)

Two more DOD contract award announcements further revealed the Company's true positioning with regard to DOD contract awards. Before the market opened on July 23, 2007, the DOD announced that it had awarded Navistar, a Force Protection competitor, a $414 million MRAP contract. A TheStreet.com article that appeared at 9:32 a.m. that day reported this fact as well as the fact that "[r]ival defense contractors have been gaining on Force Protection in the race to build armored trucks to protect U.S. troops overseas from bomb attacks." (Duffy Decl. Ex. 24.) Thereafter, the Company's stock price fell again, from $19.23 per share at the close on July 20, 2007, to $17.39 per share when it closed on July 23, 2007. (The market was closed on July 21 and 22, 2007). (Duffy Decl. Ex. 25.) Similarly, on August 8, 2007, Force Protection's stock price declined $2.95 per share to close at $15.15 per share (Duffy Decl. Ex. 26) after it was announced that General Dynamics was awarded a contract to manufacture 600 MRAPs without Force Protection. (Duffy Decl. Ex. 27.)

On November 14, 2007, the Company belatedly announced that it had received – and concealed – numerous DOD reports that were highly critical of the Company and that the problems identified therein put its ability to win new contracts at risk. (Duffy Decl. Ex. 12 at 43-44.) These revelations caused the Company's stock price to fall further, from $17.70 per share at the close of trading on November 13, 2007, to $15.75 per share at the close of trading on November 14, 2007. (Duffy Decl. Ex. 28.)

Thereafter, after the close of trading on February 29, 2008, the Company disclosed that it had discovered "significant accounting errors" which would delay the filing of its 2007 year-end results and require restatement of all previously reported 2007 quarterly results. (Duffy Decl. Ex. 29.) On the same day, the Company disclosed that Defendants Pollard and Durski had been fired. (Duffy Decl. Ex. 30.) This news caused the Company's stock price to fall 13% from

$4.11 per share at the close of trading on February 29, 2008, to $3.58 per share at the close on March 3, 2008. (The market was closed on March 1 and 2, 2008). (Duffy Decl. Ex. 31.)

Finally, on March 17, 2008, Force Protection said it would again delay the release of its 2007 financial results as the "scope of the work" identifying weaknesses in its financial reporting would take longer than expected. (Duffy Decl. Ex. 32.) The stock, which closed at $2.40 per share on March 12, 2008, closed at $1.37 per share on March 17, 2008. (Duffy Decl. Ex. 33.)

### D. Defendants McGilton And Kavanaugh Traded On Material, Non-Public Information

Defendants McGilton and Kavanaugh sold large amounts of stock during the Class Period, during which time they had knowledge of the above-referenced undisclosed material information, but public investors did not. Such sales occurred on the following dates in 2007: January 24, January 25, and January 26 (Duffy Decl. Ex. 34); April 24, April 25, and April 26 (Duffy Decl. Ex. 35); May 14 and May 15 (Duffy Decl. Ex. 36); May 21, May 22, and May 23 (Duffy Decl. Ex. 37); and May 30 and May 31 (Duffy Decl. Ex. 38).

Lead Plaintiffs Panteli Poulikakos, George and Niki Poulikakos, and Bhadra Shah purchased Force Protection shares on the following dates in 2007: January 24, January 26, May 15, May 22, and May 31. (*See* Motion of the Chicago Laborers Group for (1) Appointment as Lead Plaintiff and (2) Approval of their Selection of Lead Counsel (Dkt. 9) ("Lead Plaintiff Motion"), Ex. B.)

## II. ARGUMENT

### A. The Class Should Be Certified

Courts in the Fourth Circuit have repeatedly recognized that "[s]ecurities litigation is particularly well suited to class action treatment." *In re Red Hat, Inc. Sec. Litig.*, No. 5:04-CV-473-BR, 2009 U.S. Dist. LEXIS 93493, at *7 (E.D.N.C. Aug. 28, 2009) (citing *In re*

*BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006)).  Indeed, the courts make clear that "in light of the importance of the class action device in securities fraud suits, 'the requirements of Rule 23 are to be construed liberally' . . . [and] any doubts about the propriety of certification should be resolved in favor of certification."  *BearingPoint*, 232 F.R.D. at 538 (citations omitted).[4]

As the U.S. Supreme Court has held, class certification does not require a determination on the merits of the allegations asserted:

> [The court has no] authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.
>
> \*          \*          \*
>
> "In determining the propriety of a class action, the question is not whether plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (citations omitted); *accord Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004) ("An evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis.").  Instead, the only question is whether Lead Plaintiffs have established the four requirements of Rule 23(a) and the two requirements of Rule 23(b).

---

[4] *See also In re Southeast Hotel Prop. Ltd. P'ship Investor Litig.*, 151 F.R.D. 597, 601 (W.D.N.C. 1993) ("It is widely accepted that class treatment is particularly appropriate for proceedings involving alleged violations of securities laws and that Rule 23 is to be construed liberally to effectuate that end."); *Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C. 1993) ("It is well-recognized that alleged violations of federal securities laws are particularly well suited for class action proceedings and that Rule 23 is to be construed liberally to effectuate that end.") (citations omitted); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 77 (D. Md. 1991) ("It is well-recognized that class actions are particularly appropriate to resolve shareholders claims alleging violations of the federal securities laws and that Rule 23 is to be construed liberally to effectuate that end.") (citations omitted); *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 325, 328 (D.S.C. 1991) ("Actions based upon securities fraud are among the most usual class actions brought under Rule 23(b)(3).").

### 1. This Action Satisfies The Standards For Class Certification Under Fed. R. Civ. P. 23(a)

Rule 23(a) provides that a class should be certified where: (i) the class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (iv) the representative parties will fairly and adequately protect the interests of the class. This litigation satisfies these requirements.

### a) The Class Is So Numerous That Joinder Of All Members Is Impracticable

Rule 23(a)(1) provides that to be certified, the class must be "so numerous that joinder of all members is impracticable." The numerosity requirement is seldom disputed in securities fraud cases because publicly traded corporations typically have large numbers of outstanding shares that are owned by a geographically diverse group of investors. *See generally BearingPoint*, 232 F.R.D. at 538 (holding that the numerosity requirement was satisfied because although the precise number of shareholders was unknown, the company had more than 194 million shares of common stock outstanding, and it was "reasonable to infer from this fact that there are hundreds, if not thousands, of potential class members dispersed throughout the country").

The proposed Class easily satisfies the numerosity requirement. During the Class Period, Force Protection's common stock was listed and actively traded on the Nasdaq stock market, which provided an open and efficient market. (Duffy Decl. Ex. 39.) Further, during the Class Period there were more than 67 million shares of Company stock outstanding. (Duffy Decl. Ex. 40.) Accordingly, although the exact number of Class members is unknown at this time, there are presumably thousands of geographically dispersed individuals and entities who purchased or

otherwise acquired Force Protection's common stock at artificially-inflated prices during the Class Period. As such, it would be completely impracticable to join such a group, thereby satisfying the numerosity requirement.

### b) Questions Of Law And Fact Are Common And Lead Plaintiffs' Claims Are Typical

Rule 23(a)(2) and (3) require that all class members share common questions of law or fact and that the claims of the representative plaintiffs are typical of those of the class. As the U.S. Supreme Court explained in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982):

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

Importantly, Rule 23(a)(2) and (3) do *not* require complete identity of named plaintiffs' claims with those of the Class. As the *BearingPoint* court explained, these requirements:

> do not "require that members of the class have identical factual and legal claims in all respects." Thus, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." In sum, the premise of class certification is that due process requires the interests of the party representing a class to be substantially *similar* to those of the unrepresented parties.

232 F.R.D. at 538 (citations omitted) (emphasis added). In this regard, the court noted that "[m]embers of a proposed class in a securities case are especially likely to share common claims and defenses" because "various defendants' acts and omissions are at the center of this case." *Id.* at 539.[5]

---

[5] *See also Friedland v. Coastal Healthcare Group*, No. 1:95cv306, 1996 U.S. Dist. LEXIS 16088, at *8 (M.D.N.C. Sept. 12, 1996) (holding that the commonality element is "satisfied easily because all claims arise out of the same alleged course of conduct, creating common

Proof of each of the claims alleged in the CC involves substantially the same facts for Lead Plaintiffs and the Class. The CC alleges that Defendants knowingly issued false and misleading statements and omitted from disclosure material facts concerning Force Protection's status as a government contractor, its position to compete for new military contracts, the effectiveness of its system of internal accounting controls, and its financial statements and profitability. Proving these allegations, the touchstone of the claims alleged, will obviously be common to all members of the Class because the Company's statements were uniformly made to members of the Class, and the material omissions equally affected all Class members. It is also indisputable that Defendants' state of mind when making the false and misleading statements (*i.e.*, scienter) is not a plaintiff-specific inquiry. Likewise, the question of whether the market price of the Company's stock was artificially inflated during the Class Period due to the alleged misstatements and omissions involves no individualized issues. Additionally, there is nothing unique about the proof that any plaintiff would proffer to prove that the Individual Defendants were "control persons" within the meaning of Section 20(a) of the Exchange Act. Thus, the CC raises numerous common questions of law and fact shared by all Class members.

> ### c) Lead Plaintiffs Will Fairly And Adequately Represent The Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is met where it appears

---

questions of fact, and recovery is sought under the same legal theories"); *Southeast Hotel*, 151 F.R.D. at 602 ("[A] course of repeated representations will satisfy the commonality requirement where the same scheme operates on a class of purchasers.") (citations omitted); *Simpson*, 149 F.R.D. at 98 ("[I]n the § 10b-5 context, misrepresentations in annual reports, interim reports, and press releases have been found to satisfy the common question requirement."); *Kirschner*, 139 F.R.D. at 78 (holding that "where the same scheme operates on a class of purchasers for the extended period of time, the requirement of (a)(2) will likely be satisfied") (citations omitted).

that the proposed representative plaintiffs and their counsel: (1) possess the qualifications and ability to litigate the case and (2) will be free of any interests antagonistic to the class. *BearingPoint*, 232 F.R.D. at 541; *see also Simpson*, 149 F.R.D. at 102; *Kirschner*, 139 F.R.D. at 79.

Here, Lead Plaintiffs satisfy both prongs of the Rule 23(a)(4) test. First, as demonstrated above, Lead Plaintiffs' interests coincide with those of other Class members. Lead Plaintiffs, like all Class members, were injured as a result of Defendants' material omissions and false and misleading public statements throughout the Class Period. Proof of Lead Plaintiffs' claims will establish the same issues of law and fact as the claims of the Class as a whole. Further, Lead Plaintiffs and the Class have precisely the same interest in achieving the maximum possible recovery.

Additionally, Lead Plaintiffs and Lead Counsel will vigorously prosecute this action. Lead Plaintiffs affirmatively petitioned the Court for the right to serve in that role; they have provided information necessary for Lead Counsel to prosecute this action; and they stand ready, willing, and able to vigorously represent the Class. Lead Plaintiffs fully understand the commitments and the fiduciary responsibilities attendant to serving as class representatives and are fully able to satisfy such responsibilities and protect the interests of the Class.

In addition to satisfying the adequacy prong of Rule 23(a)(4), Lead Counsel also satisfies the considerations of Rule 23(g) and should be appointed as Class Counsel. Rule 23(g)(4) requires the court to appoint counsel who will fairly and adequately represent the Class. In appointing class counsel, Rule 23(g)(1)(A) requires the court to consider the following factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of

claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit in representing the class."

These factors support granting the motion here. First, Lead Counsel has worked vigorously to prosecute this action since their appointment. They investigated the claims, drafted and filed a Consolidated Class Action Complaint, and defeated Defendants' motion to dismiss. If appointed as Class Counsel, Lead Counsel will continue to work to prove the claims being prosecuted by Lead Plaintiffs on behalf of themselves and the Class.

Second, Lead Counsel is highly experienced in class action litigation. As demonstrated by the firm resumes included herewith (*see* Duffy Decl. Ex. 41, 42), Lead Counsel has extensive experience in the prosecution and successful resolution of complex securities fraud class actions in courts throughout the United States. As a result, they have vast knowledge of the applicable securities laws at issue here. Moreover, they have demonstrated their willingness to commit substantial resources to representing the Class in this action through their prosecutorial efforts to date.

There should be no question about the competence of counsel to fairly and adequately represent the interests of the Class. The requirements of Rule 23(a)(4) and Rule 23(g) are therefore satisfied, and Lead Plaintiffs' choice of counsel should be appointed as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

### 2.    The Conditions Of Rule 23(b)(3) Are Satisfied By The Proposed Class

In addition to meeting the requirements of Rule 23(a), this action also satisfies the requirements of Rule 23(b) – that common questions of law or fact predominate over individual questions and that class action treatment is superior to other available methods of adjudication. "Securities fraud actions typically meet the Rule 23(b)(3) requirement because the claims relate

to acts or omissions of the same defendants and damages of individual class members might be too small to provide incentive for the individuals to sue." *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 109 (E.D. Va. 2009), citing *BearingPoint*, 232 F.R.D. at 542, citing *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.") (citations omitted).

### a)    Common Questions Of Law Or Fact Predominate

Rule 23(b)(3) requires that common questions of law and fact predominate over questions affecting individual members. "The inquiry with respect to the predominance standard focuses on the issue of liability, and 'if the liability issue is common to the class, common questions are held to predominate over individual ones.'" *BearingPoint*, 232 F.R.D. at 542 (citation omitted). Damages are less central to the predominance inquiry; courts generally hold that "'differences in damages among the potential class members do not generally defeat predominance if liability is common to the class.'" *Id.* (citation omitted). Indeed, the "predominance" requirement does not demand that every single issue in the case be common to all the class members, but only that there are substantial common issues which "predominate over individual ones." *Red Hat*, 2009 U.S. Dist. LEXIS 93493, at *20; *see also South Carolina Nat'l Bank*, 139 F.R.D. at 331.

Here, the CC alleges that all members of the Class were damaged by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act. In order to prove these claims, Lead Plaintiffs must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Red Hat*, 2009 U.S. Dist. LEXIS 93493, at *20-*21. The Section 20(a) claims require additional proof that the named

defendants controlled a violator of Section 10(b).  It is well-settled that a plaintiff can demonstrate virtually all of these elements through common proof.  *Id.* at *21 (citations omitted).

The common questions implicated by the elements of these claims predominate over individual considerations.

### (i)   Whether Defendants Made, Or Controlled Those Who Made, False Statements With Scienter Is A Common Question

As discussed above, proving that Defendants either made material misrepresentations or omissions with scienter, or controlled those who did, will depend upon evidence that is common to each member of the Class – what statements did each defendant make, what information did such defendants possess at the time of making, what facts suggest that those statements were false or misleading, whether facts that were omitted from disclosure were material, what evidence exists suggesting that the Individual Defendants "controlled" a person or entity who made such statements.  For this reason, courts in this Circuit have noted that most of the elements of Section 10(b) and 20(a) claims are "generally amenable to common proof."  *Red Hat*, 2009 U.S. Dist. LEXIS 93493, at *21 (citations omitted).

### (ii)   Reliance-Related Issues Will Be Resolved On A Common Basis

The Fourth Circuit has also embraced the long settled rule, first announced by the U.S. Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), that reliance can be treated as a common issue in a securities fraud case by application of the fraud-on-the market theory.  In *Basic*, the Supreme Court explained that:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . .  The causal connection

> between the defendants' fraud and the plaintiffs' purchase of stock in such a case
> is no less significant than in the case of direct reliance on misrepresentations."

*Id.* at 241-42 (citation omitted).   The Fourth Circuit recently summarized this theory by explaining that reliance is presumed because "'an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.'"   *Gariety*, 368 F.3d at 363 (quoting *Basic*, 485 U.S. at 247).

In order to trigger application of the presumption of reliance under the fraud-on-the-market theory, a plaintiff must prove:   "'(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; and (4) that the plaintiff purchased the shares after the misrepresentations but before the truth was revealed.'"   *Id.* at 364 (quoting *Basic*, 485 U.S. at 248 n.27).   These elements are present here.

First, it is indisputable that Defendants made the public statements alleged to be false and misleading.  (Duffy Decl. Ex. 12 at 43.)  Second, these alleged false statements were material.  It is well established that "[a] fact is material 'if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.'"   *Red Hat*, 2009 U.S. Dist. LEXIS 93493, at *25 (citation omitted).   Here, the statements and omissions at issue concerned issues critical to the Company's future business prospects and profitability and, by extension, its future stock price. Indeed, it is undisputed that the price of the Company's stock dropped after the revelations identified in the CC.

Third, with respect to the efficiency of the market, the Fourth Circuit has held that "to determine whether a security trades on an efficient market, a court should consider factors such

as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals." *Gariety*, 368 F.3d at 368 (citation omitted). Force Protection had more than 67 million shares of common stock outstanding throughout the Class Period (Duffy Decl. Ex. 40), and the average trading volume was nearly 2.3 million shares per day. (Duffy Decl. Ex. 43.) In addition, Force Protection was the subject of substantial financial news coverage throughout the Class Period and was followed by several securities analysts. (*See, e.g.*, Duffy Decl. Ex. 6, Ex. 7.) Thus, it is evident that Force Protection stock traded on an open and efficient market, the price of which, at any given time, reflected all publicly available information about the Company.

Fourth, Lead Plaintiffs purchased Force Protection shares after the misrepresentations were made and before the truth was fully revealed. As demonstrated by Lead Plaintiffs' transaction certifications, one or more Lead Plaintiffs purchased shares in the Company in each month from January 2007 through February 2008. (*See* Lead Plaintiff Motion, Ex. B.) These purchases were undeniably followed by disclosures which "revealed" the truth about Defendants' prior misstatements. On November 14, 2007, for example, the Company admitted for the first time that it had received "at least eight" adverse reports from the DOD. (Duffy Decl. Ex. 12 at 43.) Moreover, in a March 3, 2008 SEC filing, the Company announced that it could not file its 2007 10-K on time because it had identified a host of material accounting weaknesses and that it would need to restate its 2007 quarterly financial statements. (Duffy Decl. Ex. 44.) These facts easily satisfy Lead Plaintiffs' burden of establishing an entitlement to the fraud-on-the-market presumption.

### (iii)    Lead Plaintiffs Will Prove Damage-Related Issues On A Class-Wide Basis

Lead Plaintiffs will also prove the elements of economic loss and loss causation on a class-wide basis.  Loss causation requires proof that the "defendant's misrepresentation was a *substantial* cause of the loss" and can be demonstrated by showing "'[a] direct or proximate relationship between the loss and the misrepresentation.'"  *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004) (emphasis in original) (citation omitted).  At trial, Lead Plaintiffs will show that there is just such a relationship between:

(1)    Defendants' material omissions and false statements about its status as a government contractor and the likelihood of future contract awards, and the Company's stock price declines that followed DOD announcements that Force Protection's competitors were receiving the bulk of new contract awards, such as those that were made prior to trading on July 23 and August 8, 2007;

(2)    All of Defendants' false statements and material omissions, and the Company's stock price decline that followed the Company's admissions on November 14, 2007 that the DOD had numerous and significant concerns about the Company that had not been previously disclosed; and

(3)    Defendants' false financial statements and assertions about internal controls, and the Company's stock price declines that followed the Company's admissions concerning the falsity of those statements, such as those that were made prior to trading on February 29, 2008.

Lead Plaintiffs will offer expert testimony, analyst reports, and news stories in order to demonstrate a relationship between these misrepresentations and the loss.  For example, Lead Plaintiffs will offer evidence, such as that contained in the following chart, which demonstrates that the Company's stock price declines on the aforementioned dates were caused by the referenced Company-specific disclosures and were not the result of industry or market-wide price trends:

| Event | Date Information Reached Market | Company Return | S&P 400 MidCap Index Return | Net Return |
|---|---|---|---|---|
| DOD announcement of $413.9 million contract to Navistar[6] | July 23, 2007 | -9.57% -$1.84 [7] | -0.23% [8] | -9.34% |
| DOD announcement of $333.8 million contract to General Dynamics[9] | Aug. 8, 2007 | -16.30% -$2.95 [10] | +1.31% [11] | -17.61% |
| Company filing of 3Q07 10-Q[12] | Nov. 14, 2007 | -11.02% -$1.95 [13] | -0.47% [14] | -10.55% |
| Company announcement of delayed 2007 10-K and need to restate 2007 quarterly results[15] | Mar. 3, 2008 | -12.90% -$0.53 [16] | +0.17% [17] | -13.07% |

Loss causation can – and will – be proven on a common basis.[18]

---

[6] Duffy Decl. Ex. 45.

[7] *Id.* Ex. 46.

[8] *Id.* Ex. 47.

[9] *Id.* Ex. 27.

[10] *Id.* Ex. 48.

[11] *Id.* Ex. 49.

[12] *Id.* Ex. 12.

[13] *Id.* Ex. 50.

[14] *Id.* Ex. 51.

[15] *Id.* Ex. 44.

[16] *Id.* Ex. 52.

[17] *Id.* Ex. 53.

[18] Defendants may argue, based on the Fifth Circuit's decision in *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), that Lead Plaintiffs must affirmatively *prove* loss causation in order to prevail on this motion. Such an argument would be baseless. *Oscar* is not the law in this Circuit. Indeed, while the Fourth Circuit has not explicitly addressed the issue, district courts in this jurisdiction (and most of those outside the Fifth Circuit) have

Thus, because common issues predominate over individual questions, the first half of Rule 23(b)(3) is satisfied.

**b)    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action**

To determine whether the "superiority" requirement of Rule 23(b)(3) is satisfied, the Court must consider the following:

1.     the interest of members of the Class in individually controlling the prosecution of separate actions;

2.     the extent and nature of any litigation concerning the controversy already commenced by members of the Class;

3.     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.     the difficulties likely to be encountered in the management of a class action.

*See* Fed. R. Civ. P. 23(b)(3)(A)-(D); *Southeast Hotel*, 151 F.R.D. at 608.  Each one of these factors weighs strongly in favor of class certification here.  It is widely recognized that, because securities cases generally involve numerous investors whose claims are too small to make

---

rejected *Oscar* as being completely inconsistent with the requirements of Rule 23.  *See, e.g.*, *Red Hat*, 2009 U.S. Dist. LEXIS 93493, at *34-*35; *Mills*, 257 F.R.D. at 108; *In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007); *BearingPoint*, 232 F.R.D. at 543; *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 638-39 (C.D. Cal. 2009); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (holding that at the class certification stage, court should not make a finding as to whether a plaintiff has established loss causation); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280-81 (S.D.N.Y. 2008) ("Loss Causation, however, relates to the merits of Plaintiffs' case and Defendants have not sufficiently established how Loss Causation is related to any necessary element of Rule 23. . . .  [P]laintiffs need only establish that they 'may be able to . . . prove loss causation' at trial.") (citation omitted); *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (noting that "[d]isputes about loss causation turn primarily on questions of fact" and therefore should be resolved on summary judgment) (citation omitted); *Ross v. Abercrombie & Fitch Co.*, 2008 U.S. Dist. LEXIS 74538, at *17 (S.D. Ohio Aug. 26, 2008) ("Loss causation is not a factor listed in Rule 23.  In a securities case, any issue relating to causation is an element of the plaintiffs cause of action.  Ordinarily, the Court should not consider the merits of the case when deciding if a class should be certified.") (citations omitted); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519 (N.D. Cal. 2009).

separate actions economically feasible, class actions are superior to other methods of adjudication.

Further, in this action, the interest of members of the Class in individually controlling the prosecution of separate actions is minimal. Indeed, the costs and expenses of such individual actions would be prohibitive when weighed against the potential individual recoveries. *See South Carolina Nat'l Bank*, 139 F.R.D. at 335 ("The losses suffered individually by each of the potential class members would not likely be sufficient to make it practical for the bond purchasers to individually bring the costly and time consuming litigation required to recover in a complex case such as this. The plaintiffs' cost for depositions, photocopying and travel expense alone in all probability will far exceed the amount that the average investor paid for these bonds."); *Austell v. Smith*, 634 F. Supp. 326, 334 (W.D.N.C. 1986) ("To require each class member to bear the expense of litigation individually would be senseless."). Granting Lead Plaintiffs' class certification motion will secure the rights of those investors who would not find it economically feasible to pursue individual actions.

Moreover, the burden on the courts from adjudicating separate actions that arise out of the same facts would be significant. *See Simpson*, 149 F.R.D. at 102 (finding that a class action was the superior method for adjudication in a securities fraud action because "'[j]oinder of all class members would be impracticable and duplicative individual trials would impose inordinate burdens on the litigants and the court.'") (citation omitted); *Austell*, 634 F. Supp. at 334 ("If class certification is not allowed, the courts may be faced with a multiplicity of suits all concerning the same proxy statement, merger, and alleged scheme to defraud."). As such, a class action is the most efficient allocation of limited court resources and will limit the possibility of duplicative

litigation.  Thus, with respect to the first two factors, all relevant considerations weigh in favor of class certification.  *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Regarding the third factor, Force Protection's principal place of business is located in this District, and the Company transacted substantial business here.  Further, much of the conduct complained of occurred in this District, and much of the evidence and many of the witnesses relevant to Lead Plaintiffs' claims are located here.  This forum, therefore, is the most desirable in which to prosecute this action.  *See* Fed. R. Civ. P. 23(b)(3)(C).  Finally, as to the last factor, there is no reason to believe that Lead Plaintiffs or their attorneys, who have substantial experience in class action litigation in this and other districts, will encounter significant or unusual difficulties in the management of this litigation.  *See* Fed. R. Civ. P. 23(b)(3)(D).

Additionally, courts have uniformly recognized that the class action vehicle is superior to other available methods for the fair and efficient resolution of large-scale securities fraud actions.  The Supreme Court has recognized that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually.  . . .  [M]ost of the plaintiffs would have no realistic day in court if a class action were not available."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).  District courts in the Fourth Circuit have similarly treated class actions as superior to other methods of adjudication of claims under the federal securities laws, and have found such claims particularly suitable to class treatment given the large number of potential plaintiffs and the likelihood that individual claims would often be too small to warrant individual suits.  *See Kirschner*, 139 F.R.D. at 80 ("Courts have recognized that a class action is the most efficient means of litigating a securities fraud suit where the class 'consists of numerous investors, many of whom in all likelihood have individual claims too small to warrant an

individual suit.'") (citation omitted); *see also Simpson*, 149 F.R.D. at 102 (finding that "the class action device is superior to other methods for adjudicating the § 10b and Rule 10b-5 claims.").

Consistent with the requirements of Rule 23(b)(3), the certification of this litigation as a class action would not only be "superior to other available methods for the fair and efficient adjudication of the controversy" (Fed. R. Civ. P. 23(b)(3)), but appears to be the sole method for fairly and efficiently litigating the claims of all members of the proposed Class.  In short, the prosecution of this action as a class action will "'achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated.'"  *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 282 (S.D. Tex. 2004) (citations omitted).

### B.    The Sub-Class Should Also Be Certified

Section 20A of the Exchange Act prohibited defendants McGilton and Kavanaugh from selling Company stock while in possession of "material, nonpublic information" and makes them liable to all persons "who contemporaneously purchased such stock."  Because Rule 23(a) and (b)(3) are satisfied with respect to these claims, they should be certified as a Sub-Class.

Joining all persons who purchased contemporaneously with the sales of defendants McGilton and Kavanaugh is obviously impracticable as millions of shares were purchased on the dates that these defendants sold Company stock.  (*See, e.g.*, Duffy Decl. Ex. 54.)  Additionally, the elements of commonality, typicality, adequacy, and predominance are all present.  Lead Plaintiffs purchased Force Protection stock on January 24, January 26, May 15, May 22, and May 31, 2007 (*see* Lead Plaintiff Motion, Ex. B) – five of the days on which these defendants sold such stock.  (*See* Duffy Decl. Ex. 34 – Ex. 38.)  Moreover, Lead Plaintiffs' ability to establish these defendants' liability turns on the same fundamental question that is common to the claims of the Sub-Class – did defendants McGilton and Kavanaugh trade while they knew,

but the public did not, about the Company's accounting and DOD-related problems, as detailed

in at least eight undisclosed DOD reports.  Finally, because the measure of damages in a Section

20A claim is "'the difference between the price the insider realizes and the market price of the

securities after the news is released,'" (*In re Microstrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620,

665 (E.D. Va. 2000) (citations omitted)), there is nothing individualized about the question of

damages.

**<u>CONCLUSION</u>**

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant their

Motion for Class Certification.

Respectfully submitted,

Dated: November 16, 2009                    **DUFFY & YOUNG, LLC**

By: /s/ Brian C. Duffy
Brian C. Duffy (Fed. Bar # 9491)
J. Rutledge Young III (Fed. Bar # 7260)
96 Broad Street
Charleston, South Carolina 29401
Telephone:  (843) 720-2044
Facsimile:   (843) 720-2047
bduffy@duffyandyoung.com
ryoung@duffyandyoung.com

*Liaison Counsel*

**BERMAN DeVALERIO**
Norman Berman, Esq.
Jeffrey C. Block, Esq.
Kristin J. Moody, Esq.
Autumn W. Smith, Esq.
One Liberty Square
Boston, Massachusetts 02109
Telephone:  (617) 542-8300
Facsimile:   (617) 542-1194
nberman@bermandevalerio.com
jblock@bermandevalerio.com
kmoody@bermandevalerio.com
asmith@bermandevalerio.com

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Marc I. Gross, Esq.
Jason S. Cowart, Esq.
R. James Hodgson, Esq.
100 Park Avenue
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
migross@pomlaw.com
jscowart@pomlaw.com
rjhodgson@pomlaw.com

*Co-Lead Counsel for the Class*