**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| **IN RE FORCE PROTECTION, INC.** | ) | Consolidated Civil |
| **SECURITIES LITIGATION** | ) | Action No. 2:08-cv-845-CWH |
| | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Eleni M. Roumel
Federal Bar No. 9959
NELSON MULLINS RILEY &
SCARBOROUGH LLP
151 Meeting Street
Charleston, SC 29401
843.534.4112 (Telephone)
843.534.4223 (Facsimile)
eleni.roumel@nelsonmullins.com

M. Robert Thornton
Michael R. Smith
David E. Meadows
Benjamin Lee
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, Georgia 30309
404.572.4600 (Telephone)
404.572.5100 (Facsimile)
bthornton@kslaw.com
mrsmith@kslaw.com
demeadows@kslaw.com
blee@kslaw.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT PROCEDURAL AND FACTUAL BACKGROUND ............................... 2

        A.      Nature of Plaintiffs' Claims and Allegations .......................................... 2

        B.      Relevant Procedural Background ............................................................ 2

III.    STANDARD PLAINTIFFS MUST MEET FOR CLASS CERTIFICATION ................. 3

IV.     ARGUMENT AND CITATION OF AUTHORITIES ...................................................... 4

        A.      The Court Should Deny Class Certification Because The Proposed Class
                Representatives Fail Rule 23's Adequacy Requirement ......................................... 4

                1.      The Court must perform a "searching" adequacy analysis. ..................... 4

                2.      The proposed representatives are inadequate as representatives. .............. 6

                        a.      The Chicago Laborers' Fund's role in the case has been grossly
                                misrepresented. ............................................................................ 8

                        b.      The other proposed class representatives were improperly
                                assembled at counsel's behest. ................................................... 12

                        c.      Plaintiffs have not coordinated to supervise the litigation. ........... 14

        B.      The Court Should Deny Class Certification Because The Proposed Class
                Representatives' Claims Are Atypical. ............................................................. 18

                1.      The Presence Of Even Arguable Defenses Unique To The Class
                        Representatives Defeats Typicality ..................................................... 18

                2.      Each Proposed Class Representative Continued To Purchase Force
                        Protection Stock Following Disclosures Of The Alleged "Fraud." .......... 19

                        a.      Plaintiffs' allegations confirm that the alleged "fraud" was
                                revealed by no later than November 13, 2007. ............................ 20

                        b.      The proposed class representatives continued to buy Force
                                Protection stock following alleged corrective disclosures. ............ 24

                3.      Mr. Trautman's And Panteli Poulikakos's Frequent High-Volume Trades
                        Subject Them To Unique Defenses. ..................................................... 25

        C.      Plaintiffs Have Failed To Demonstrate Application Of The Fraud-On-The-Market
                Presumption (Or The Presumption Has Been Rebutted). ..................................... 28

                1.      Fraud-On-The-Market Presumption Requires A Showing That Alleged
                        Misrepresentations Moved The Market Price Of The Stock. ................... 28

                2.      Plaintiffs Have Not Demonstrated Application Of The Presumption. ..... 31

        D.      If A Class Is Certified, The Class Period Must End On November 13, 2007. ..... 35

## TABLE OF AUTHORITIES

**CASES**

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,*
    --- F.3d ----, 2010 WL 481407 ................................................................30, 32

*Basic v. Levinson,*
    485 U.S. 224 (1988) ...........................................................................*Passim*

*Berger v. Compaq Computer Corp.,*
    257 F.3d 475 (5th Cir. 2001) .............................................................. 4-5, 14

*Darvin v. Int'l Harvester Co.,*
    610 F. Supp. 255 (S.D.N.Y. 1985) ......................................................... 6-7

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 343 (2005) .........................................32

*Epstein v. Am. Reserve Corp.,*
    No. 79 C 4767, 1988 WL 40500 (N.D. Ill. Apr. 21, 1988) ....................................19

*Fener v. Operating Eng'rs Constr. Indus. and Miscellaneous Pension Fund (LOCAL 66),*
    579 F.3d 401 (5th Cir. 2009) ....................................................... 30-32, 34

*Gariety v. Grant Thornton, LLP,*
    368 F.3d 356 (4th Cir. 2004) ..............................................................*Passim*

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,*
    903 F.2d 176 (2d Cir. 1990) ............................................................. 18-19, 24

*Greenberg v. Crossroads Sys., Inc.,*
    364 F.3d 657 (5th Cir. 2004) ........................................................30, 33, 35

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) .....................................................................18

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997) .....................................................................29

*In re Cendant Corp. Sec. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ........................................................................7

*In re Cont'l Ill. Sec. Litig.,*
    750 F. Supp. 868 (N.D. Ill. 1990), *rev'd on other grounds*, 962 F.2d 566 (7th Cir.
    1992) .................................................................................................16

*In re Donkenny, Inc. Sec. Litig.,*
   171 F.R.D. 156 (S.D.N.Y. 1997) .......................................................................10

*In re Microstrategy Sec. Litig.,*
   110 F. Supp. 2d 427 (E.D. Va. 2000) ..........................................................5, 14, 25

*In re Nature's Sunshine Prods., Inc. Sec. Litig.,*
   251 F.R.D. 656 (D. Utah 2008) ...............................................................24, 35

*In re Network Assocs., Inc. Sec. Litig.,*
   76 F. Supp. 2d 1017 (N.D. Cal. 1999) .........................................................6, 16

*In re Safeguard Scientifics,*
   216 F.R.D. 577 (E.D. Pa. 2003).............................................................19, 24, 27

*In re Safety-Kleen Corp. Bondholders Litig.,*
   No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004) .................................3

*In re Tarragon Corp. Sec. Litig.,*
   2007 U.S. Dist. LEXIS 91418 (S.D.N.Y. Dec. 6, 2007) .........................................6

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and
   Securitization, LLC,*
   616 F. Supp. 2d 461 (S.D.N.Y. 2009)......................................................4, 8, 10-11

*Koenig v. Benson,*
   117 F.R.D. 330 (E.D.N.Y. 1987) ........................................................................16

*Kovaleff v. Piano,*
   142 F.R.D. 406 (S.D.N.Y. 1992) ...................................................................19, 24

*Krim v. pcOrder.com, Inc.,*
   210 F.R.D. 581 (W.D. Tex. 2002) ................................................................. 17-18

*Nathenson v. Zonagen, Inc.,*
   267 F.3d 400 (5th Cir. 2001) ...........................................................................29

*No. 84 Employer-teamster Joint Council Pension Trust Fund v. America West Holding
   Corp.,*
   320 F.3d 920 (9th Cir. 2003) ...........................................................................29

*Ogden v. AmeriCredit Corp.,*
   225 F.R.D. 529 (N.D. Tex. 2005) ...................................................................5, 11

*Oran v. Stafford,*
   226 F.3d 275 (3d Cir. 2000)..............................................................................29

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ........................................................................*Passim*

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
    136 F.R.D. 658 (D. Or. 1991) .................................................................. 18-19, 24

*Shiring v. Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D. Va. 2007) ....................................................................*Passim*

*Shriver v. Impac Mortg. Holdings, Inc.*,
    2006 U.S. Dist. LEXIS 40607 (C.D. Cal. May 2, 2006) .....................................6, 16

*Tsirekidze v. Syntax-Brillian Corp.*,
    No. CV-07-2204-PHX-FJM, 2008 WL 942273 (D. Ariz. Apr. 7, 2008) ......................*Passim*

*Weinstein v. Am. Biomaterials Corp.*,
    123 F.R.D. 442 (S.D.N.Y. 1988) .........................................................................6

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23, 2003 .............................................................................................4

Report on the Private Securities Litigation Reform Act of 1995, S. Rep. No. 104-98
    (1995), *reprinted in* 1995 U.S.C.C.A.N. 679.................................................9

## I.    INTRODUCTION

Plaintiffs have failed to carry their burden of demonstrating that this case can be certified as a class action. It is beyond clear that the proposed class representatives are incapable of fairly and adequately representing the absent class members. First, discovery has revealed that the proposed representatives have not been forthright, candid, or accurate in representations to the Court, making them unsuitable fiduciaries to represent a class. Second, despite their assurances to the Court, the proposed representatives have demonstrated at every turn that they are unwilling and unable to control the litigation, and instead have completely abdicated such responsibility to their counsel. Neither the Private Securities Litigation Reform Act of 1995 (the "Reform Act" or "PSLRA") nor Rule 23 will tolerate such abdication of responsibility and control over the case by the proposed class representatives. Third, the fact that proposed class representatives purchased Force Protection shares *after* the alleged fraud was revealed and engaged in highly unusual and speculative "day trading" subjects them to unique defenses concerning their reliance on the alleged misrepresentations challenged in the Complaint. As such, they fail Rule 23's typicality requirement and are unfit to serve as class representatives.

Finally, Plaintiffs have not shown that common issues of law and fact will predominate over individual ones, particularly concerning the element of reliance. Although Plaintiffs assert that the class is entitled to a judicial presumption of reliance under *Basic v. Levinson,* 485 U.S. 224 (1988), they have not made the showing required for its application because of their failure to establish that the alleged misrepresentations were material by submitting any competent evidence that Plaintiffs' losses were caused by the revelation of "fraud" as opposed to other negative information as required by *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,* 487 F.3d 261 (5th Cir. 2007) and other cases.

For each of these reasons, class certification must be denied.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.    Nature of Plaintiffs' Claims and Allegations

Plaintiffs' Consolidated Class Action Complaint filed on November 6, 2008 (the "Complaint") alleges that Defendants defrauded Force Protection's investors through alleged public material misrepresentations about the Company's performance, prospects, financial results, and internal accounting controls. *See, e.g.,* Compl. ¶¶ 1-12. The Complaint identifies four categories of alleged "fraud":

- allegedly false or misleading projections that the Company would continue to win contracts to build MRAP vehicles for authorized customers (Compl. ¶¶ 3, 127, 131, 152);

- allegedly false or misleading statements that Force Protection was in compliance with applicable defense contractor regulations (*Id.* ¶¶ 3, 77, 126);

- alleged misrepresentations regarding the effectiveness of the Company's internal controls over financial reporting and disclosures (*Id.* ¶¶ 4, 6, 48-50); and

- misstatements of reported earnings for the first three quarters of fiscal year 2007 (*Id.* ¶¶ 2, 45-47).

According to the Complaint, the alleged misrepresentations caused the price of Force Protection stock to be "artificially inflated" until a series of alleged "partial revelations" revealed to investors that the challenged statements had been false and misleading. *Id.* ¶¶ 174, 133-70.

### B.    Relevant Procedural Background

Before Plaintiffs filed their Complaint, the Court consolidated several previously-filed complaints alleging substantially similar claims and appointed Plaintiffs in charge of prosecuting the case. *See* Docket Nos. 74 & 81. Based in large part on their certifications regarding the size of their investment losses and their claimed efforts and intent to coordinate to oversee the litigation, the Court determined that Plaintiffs were presumptively the "most adequate" of the candidates seeking to be placed in charge of prosecuting this case on behalf of the proposed class. *See* Docket No. 81 at 9-12. Plaintiffs filed their motion seeking certification of the

consolidated case as a class action on November 16, 2009.  *See* Docket No. 141.  On February 5, 2010, Plaintiffs filed an amendment to their motion, withdrawing the prior request that two Plaintiffs be appointed to serve as class representatives and stating that the interests of the class would be "better served" by the withdrawal of those individuals.  Docket No. 153.

## III.     STANDARD PLAINTIFFS MUST MEET FOR CLASS CERTIFICATION

Rule 23(a) provides that a class may be certified "*only* if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a) (emphasis added).  Rule 23(b) further requires that "questions of law or fact common to the members . . . predominate over any questions affecting only individual members . . . ."  Fed. R. Civ. P. 23(b).  Plaintiffs bear the burden to affirmatively demonstrate by a preponderance of the evidence that each of these requirements for class certification is satisfied.  *See Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 362, 370 (4th Cir. 2004) (vacating and remanding class certification order); *In re Safety-Kleen Corp. Bondholders Litig.,* No. 3:00-1145-17, 2004 WL 3115870, at *2 (D.S.C. Nov. 1, 2004) (decertifying class).

The public function performed by district courts in deciding whether the requirements for certification of a case as a class action have been satisfied is a weighty one that ought not be taken lightly.  *Gariety,* 368 F.3d at 366-67.  A district court must conduct a "rigorous analysis" to determine whether Rule 23's standards have been satisfied.  *Gariety,* 368 F.3d at 367.  The Court should "make whatever factual and legal inquires are necessary under Rule 23. . . .  And if some considerations . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits" sufficient to allow for the required findings concerning plaintiff's Rule 23 showing.  *Id.* at 366 (quotation omitted).  Contrary to Plaintiffs' suggestions that Rule 23 should

be construed "liberally" and that "any doubts about the propriety of certification should be resolved in favor of certification," Pl. Br. at 10, Rule 23 commands this Court to deny certification unless and until it is satisfied that the requirements of Rule 23 have been met.  *See* Fed. R. Civ. P. 23, 2003 Adv. Comm. Notes; *Gariety,* 368 F.3d at 366, 370 (reversing and remanding certification order; affirming that record must support findings that Rule 23 requirements are satisfied before certification proper).   Judged by the applicable rigorous standards, Plaintiffs have failed to satisfy Rule 23.  Class certification therefore must be denied.

## IV.    ARGUMENT AND CITATION OF AUTHORITIES

### A.    The Court Should Deny Class Certification Because The Proposed Class Representatives Fail Rule 23's Adequacy Requirement.

#### 1.    The Court must perform a "searching" adequacy analysis.

Rule 23(a)(4) requires proposed class representatives to demonstrate that they will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[I]n the securities fraud context that adequacy inquiry must be ***particularly searching***" and should take into account the intent of Congress in passing the Reform Act that "investors . . . , ***not their lawyers***, control securities litigation."  *Shiring v. Tier Techs., Inc.,* 244 F.R.D. 307, 315-17 (E.D. Va. 2007) (denying class certification where lead plaintiff failed to demonstrate "that he, rather than his counsel, is in control of the litigation") (emphasis added); *see also Berger v. Compaq Computer Corp.,* 257 F.3d 475, 484 (5th Cir. 2001) ("[I]n complex class action securities cases . . ., the adequacy standard must reflect . . . Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases.").

Accordingly, courts consistently have held that plaintiffs who appear to be merely stand-ins affording their attorneys a key to the courthouse are inadequate to serve as class representatives.  *See, e.g., Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset*

*Servicing and Securitization, LLC,* 616 F. Supp. 2d 461, 466 (S.D.N.Y. 2009) (pension fund plaintiff that joined lawsuit at counsel's behest without undertaking any independent investigation was inadequate); *Shiring,* 244 F.R.D. at 316 (plaintiff who decided to pursue litigation only after responding to law firm's press release and based solely on firm's investigation was inadequate); *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) (same). An adequate class representative must have an understanding of the claims asserted that extends beyond "derivative knowledge acquired solely from counsel." *Shiring,* 244 F.R.D. at 316; *see also Berger,* 257 F.3d at 483; *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 533 (N.D. Tex. 2005). In addition, an adequate class representative "must show an inclination to take an active role in monitoring class counsel's activities." *Ogden*, 225 F.R.D. at 535 (internal quotation omitted); *Shiring,* 244 F.R.D. at 316.

Where, as here, a group of individuals proposes to represent the class, there should be some rationale for the group's coalescence beyond the fact that the aggregation of claimed collective losses furthers counsel's effort to show that it has amassed the group with the "largest financial interest" and should therefore be put in charge of the case (and given the chance to collect a contingency fee). *See In re Microstrategy Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (group that appeared to be "merely a diverse collection of plaintiffs assembled by [counsel] for the purpose of winning the lead plaintiff role" was found inadequate); *Eichenholtz v. Verifone Holdings, Inc.,* No C 07-06140 MHP, 2008 WL 3925289, at *7 (N.D. Cal. Aug. 22, 2008) ("courts have uniformly refused to appoint as lead plaintiffs groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff"); *Syntax-Brillian*, 2008 WL 942273, at *3 ("[W]hen

unrelated investors are cobbled together, the clear implication is that counsel, rather than the parties, are steering the litigation."). The group also must demonstrate that it will act cohesively and coordinate effectively in managing the litigation. *See Shriver v. Impac Mortg. Holdings, Inc.,* 2006 U.S. Dist. LEXIS 40607, at *25-27 (C.D. Cal. May 2, 2006) (denying investor groups' motions to be appointed lead plaintiffs due to failure to make such showing); *In re Tarragon Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 91418, at *6 (S.D.N.Y. Dec. 6, 2007) (adequacy finding requires "some evidence that the members of the group will act collectively and separately from their lawyers"); *In re Network Assocs., Inc. Sec. Litig.,* 76 F. Supp. 2d 1017, 1026 (N.D. Cal. 1999) ("A 'group of persons' [appointed as lead plaintiffs] . . . should, like an institution or a single large investor, be able to actively oversee the conduct of the litigation and monitor the effectiveness of counsel.").

The "adequacy" analysis also should include an assessment of whether Plaintiffs have demonstrated the requisite level of credibility and integrity to be entrusted to the fiduciary role of representing absent class members. *Shiring,* 244 F.R.D. at 315-17 (denying class certification where misrepresentations in sworn certifications to court showed that lead plaintiff lacked sufficient honesty and integrity to serve as class representative); *see also Weinstein v. Am. Biomaterials Corp.*, 123 F.R.D. 442, 466 (S.D.N.Y. 1988) (denying class certification where plaintiffs' "credibility is subject to serious question and to serious doubt"); *Darvin v. Int'l Harvester Co.,* 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (noting that credibility problems provide a basis for denying plaintiff's motion to be named class representative).

### 2.    The proposed representatives are inadequate as representatives.

When seeking appointment as lead plaintiffs in this case, Plaintiffs touted themselves as "the perfect blend" of investors to lead a securities class action lawsuit. *See* Docket No. 39, pp. 8. They falsely or misleadingly portrayed themselves as an organized and motivated group

comprised of an institutional investor that Plaintiffs claimed would "provide the sophistication and resources necessary for a complex securities class action lawsuit," a supposedly "pre-existing" family group, and another individual investor. *Id.*, pp. 8-9. Each Plaintiff represented that he or she had determined it to be in his/her best interests to join with the group in seeking lead plaintiff appointment. *See* Docket No. 39-2, ¶¶ 1-7. The group further assured the Court that its members had "conferred with one another regarding the coordination of the prosecution of this litigation" and that at least three of its seven members would "communicate on at least a quarterly basis . . . regarding the progress and prosecution of this action." Docket No. 39, p. 9.; *see also* Docket No. 39-1, ¶ 9.

This Court relied significantly on those representations in concluding, for purposes of lead plaintiff appointment, that Plaintiffs had made a sufficient demonstration of their "ability and commitment to prosecute the action vigorously." *See* Docket No. 81 at 9-12.[1] In particular, the Court observed that the case for Plaintiffs' appointment was bolstered by the presence of "a sophisticated public pension fund, which has both the resources and the experience to effectively manage this litigation." *Id.* at 9. The Court also relied on the representation that Plaintiffs had "conferred with one another regarding the coordination of the prosecution of this litigation" and "agreed to have quarterly conference calls to oversee the status of the case" in concluding that "it appears that [Plaintiffs] will be able to actively supervise the conduct of the litigation, thereby satisfying the adequacy requirement of Rule 23." *Id.* at 11-12.

Astonishingly, nearly every one of Plaintiffs' key representations about its membership, formation, and efforts to coordinate supervision of the case were, at best, inaccurate and highly

---

[1] Candidates seeking appointment as lead plaintiffs need make only a *prima facie* showing that they can adequately represent the class. *In re Cendant Corp. Sec. Litig.,* 264 F.3d 201, 263 (3d Cir. 2001). A more probing adequacy analysis must be conducted before a class is certified.

misleading. The truths about Plaintiffs' actual level of participation in this case that were distorted by their assurances to the Court – many of them under oath – confirm that Plaintiffs fall far short of the standards of "adequate" class representatives. Further, Plaintiffs' apparent willingness to mislead the Court concerning matters that cut to the heart of their fitness (or, more properly, their unfitness) to serve as class representatives confirms that Plaintiffs lack the credibility and integrity required to entrust them to the fiduciary role of class representative. *Shiring*, 244 F.R.D. at pp. 316-317 (finding plaintiff in a securities class action an inadequate representative because false statements to the court, even if due only to inadvertence or indifference, prevented demonstration of the requisite credibility and conscientiousness necessary to be appointed fiduciary for the class).

> **a.      The Chicago Laborers' Fund's role in the case has been grossly misrepresented.**

Plaintiffs' representations as to the "sophistication and resources" of the Chicago Laborers' Fund and the role the Fund purportedly would play in managing and directing the litigation, *see* Docket No. 39, p. 8; Docket No. 39-1, ¶ 1, plainly were intended to resonate with the Reform Act's preference for institutional investor lead plaintiffs, whom courts presume will "act like a 'real' client, carefully choosing counsel and monitoring counsel's performance." *Iron Workers,* 616 F. Supp. 2d at 464 (quotations omitted). In truth, the Fund's actual involvement and participation in this case has been a far cry from that institutional investor ideal.

> **(i)      *The Fund's participation in this case was procured through an improper "portfolio monitoring" agreement.***

As an initial matter, the Fund only began to consider bringing claims against the defendants *after* the Berman DeValerio law firm, which provides free "portfolio monitoring" services to the Fund, informed the Fund's Executive Director, James Capasso, that the Fund "had a considerable loss [on its Force Protection stock holdings and] . . . should consider becoming a

lead plaintiff." Ex. A at 33. Prior to being informed of the Fund's "considerable loss" by Berman DeValerio, *Mr. Capasso was not even aware that the Fund had invested in Force Protection stock*. *Id.* at 184. Indeed, he admitted that *the Fund had no role whatsoever in any decision concerning its investments in Force Protection,* having delegated full authority concerning all such decisions to its investment manager, Columbia Partners LLC Investment Management. *Id.* at 179-81.[2] Mr. Capasso testified that he decided that the Fund should join this lawsuit and seek appointment as lead plaintiff on the basis of a "half-hour" discussion with a Berman DeValerio partner and without conducting any investigation of his own. *Id.* at 42-43. Mr. Capasso then presented his own summary of that meeting to the Fund's Board of Trustees, at an April 15, 2008 meeting, and, *voila*, the Fund was a candidate for lead plaintiff. *Id.* at 44-46; Ex. C at CL0000045. Because the Berman DeValerio firm had made the suggestion that the Fund become involved in the suit, the Fund retained Berman DeValerio to represent it *without considering any other law firm for the job*. Ex. A at 40-41.

That chronology is directly antithetical to the process intended for an adequate class representative for a securities class action. With the Reform Act, Congress sought to "mak[e] it harder for lawyers to invent a suit and then attach a plaintiff" as plaintiffs' counsel did here with the Fund. Report on the Private Securities Litigation Reform Act of 1995, S. Rep. No. 104-98, at

---

[2] Mr. Capasso testified that Columbia Partners, who actually executed the Fund's investments in Force Protection stock, has never communicated that it believes Defendants defrauded investors. *See* Ex. A at 189-91. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

**REDACTED**                                   -9-

10 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 689 ("Senate Report"). Accordingly, a proposed class representative who elects to pursue claims only after responding to a solicitation from counsel and whose understanding of the asserted claims derives solely from information acquired from counsel is inadequate under Rule 23. *See Iron Workers,* 616 F. Supp. 2d at 464-66; *Shiring,* 244 F.R.D. at 316; *Syntax-Brillian*, 2008 WL 942273, at *4; *c.f., In re Donkenny, Inc. Sec. Litig.,* 171 F.R.D. 156, 158 (S.D.N.Y. 1997) ("Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the plaintiff.").

The *Iron Workers* decision neatly captures the problem with portfolio monitoring arrangements such as the one through which the Fund's participation in this suit was procured:

> [Such arrangements] create[] a clear incentive for [the monitoring firm] to discover "fraud" in the investments it monitors and to recommend to the Fund's non-lawyer administrator (and, through him, to the trustees) that the Fund, at no cost to itself, bring a class action lawsuit. In other words, the practice fosters the very tendencies toward lawyer-driver litigation that the PSLRA was designed to curtail.

616 F. Supp. 2d at 464. In *Iron Workers*, the district court concluded that a pension fund that sought appointment as lead plaintiff solely on the basis of advice from a monitoring firm and hired the same firm as litigation counsel without undertaking any investigation of its own regarding the substance of the claims (or indeed whether monitoring counsel's advice was disinterested) would not adequately represent the class. *Id.* at 465-66. A like finding is warranted here as to the Chicago Laborers' Fund.

### (ii) *The Fund has not played an active role in the lawsuit.*

Further, since being persuaded by its attorneys to join the lawsuit, the Fund has done virtually nothing to play an active role in managing or actively overseeing the litigation, but has instead admittedly deferred to counsel to manage the lawsuit and make virtually every key decision in the case to date. Mr. Capasso testified that he believed he need exercise only a

"cursory level" of supervision of the case on behalf of the Fund. Ex. A at 22. He described his involvement in the suit as entirely reactive to and reliant upon counsel:

> Q:    Okay. I think you said you view your responsibilities as -- in connection with this lawsuit, as supervising on a cursory or high level, is that right?
>
> A:    Along with taking direction from the lawyers we've hired, right.
>
> Q:    Okay.
>
> A:    Other than that, I have no movement of this lawsuit. I'm just there to answer questions just like you're asking me questions.

*Id.* at 23; *see also id.* at 60 ("The day-to-day operation of the lawsuit is maintained by Berman DeValerio. If there's something that is of importance that would affect the lawsuit, they would have told me . . . ."); *id.* at 98 (when asked how the Fund plans to oversee the case going forward: "We will take the calls [to be scheduled by counsel] and we will react to our counsel's direction."); *id.* at 155 ("[I]f there's something on the case that . . . we should know about . . . we hope that our attorneys would give us the information we would need to monitor things . . . ."). Indeed, when asked to describe what, if anything, the Fund had done to oversee this case, all Mr. Capasso could point to was that the Fund had provided its attorneys with an accounting of the Fund's purchases and sales of Force Protection stock and listened to periodic status updates regarding the case from counsel. *Id.* at 75-76. This passive approach to oversight of the litigation is precisely the opposite of the sort of active and engaged case management that is required of an adequate class representative. *See Ogden,* 225 F.R.D. at 535.

Mr. Capasso even admitted that his sworn statement to the Court that the Fund would "provide the sophistication and resources necessary for a complex securities class action lawsuit," *see* Docket No. 39-2, ¶ 1, was incorrect. Mr. Capasso testified that the Fund lacked the "expertise in-house to do that" and, in fact, was relying on its lawyers to supply the "sophistication and resources" required for prosecution of the case. Ex. A at 132-33.

> Q:     Okay.  All right.  You agree that, to maintain a class action lawsuit, it's necessary that the parties prosecuting it have a degree of sophistication and resources, correct?
>
> A:     Absolutely.
>
> Q:     And is it your testimony that, in this case, notwithstanding how this sentence [of paragraph 1 of Docket No. 39-2] reads, the fund was relying on Berman DeValerio to supply that sophistication and resources?
>
> A:     Over and above what we could, yes.
>
> Q.     Okay.  What elements of that sophistication and resources could the fund provide?
>
> A:     Just information based on the investment manager, the securities that were bought and sold, and any related information that we would have about the issue, and that would be it.  We would have to, then, defer to our representatives, which would be Berman DeValerio and other class counsel.

*Id.* at 133-34.  Regarding "resources," Mr. Capasso testified that the Fund has no financial responsibility whatsoever for attorneys' fees or litigation expenses in this case.  *Id.* at 48-49.  Instead, its lawyers are fronting the litigation costs and will be paid a percentage – Mr. Capasso did not know *what* percentage – of any monetary recovery won by the class.  *Id* at 48.

Lead Plaintiffs' depiction of the Fund as an engaged and motivated client that would bring "sophistication and resources" to the prosecution of this case was in fact just an empty nod to the Reform Act's preference for institutional investor lead plaintiffs.  While that portrayal may have helped plaintiffs' lawyers win control of this case and a shot at a fee, the reality of the Fund's lack of engagement and wholesale deference to counsel to manage and control key decisions in the case (*see infra,* at 15-17) preclude a finding that the Fund is a fit representative.

### b.     The other proposed class representatives were improperly assembled at counsel's behest.

Mr. Trautman and Panteli Poulikakos, whom Lead Plaintiffs have identified as the "spokesperson" for the remaining Lead Plaintiffs, *see* Docket No. 39-1, ¶¶ 2-6, testified that they decided to seek lead plaintiff appointment only after responding to press releases about the

litigation issued by law firms.  Ex. D at 66-67; Ex. E. at 57-59.  Tellingly, before obtaining the benefit of his lawyers' views as to what his claims against Defendants should be, Mr. Poulikakos wrote an e-mail to several Force Protection executives on March 5, 2008, in which he complained that he had lost $300,000 on his Force Protection investments "due to your company failing to get contracts and management doing a poor job of fighting the naked shorting done by hedge funds and misreporting by Melissa Davis of TheStreet.com."  *Id.*[3]  Thus, *before* responding to attorneys' solicitations seeking lead plaintiff candidates, Mr. Poulikakos believed his investment losses were caused by factors other than alleged "fraud" by the Defendants.  Yet *after* speaking with the lawyers, Mr. Poulikakos decided that he and the other members of his "family group" should seek appointment as lead plaintiffs and ultimately file a complaint alleging "fraud."   Niki Poulikakos likewise testified that she did not believe she had been defrauded and had not considered suing Force Protection prior to speaking with her lawyers.  *See* Ex. F at 105-07.   Similarly, Mr. Trautman testified that he only began to hold the view that Defendants had misrepresented Force Protection's compliance with government contracting requirements "during discussions with my attorneys."   Ex. D at 53.   The considerable metamorphoses in Lead Plaintiff's views on these points responding to lawyers' solicitations further attests to the degree to which the lawyers rather than Plaintiffs are the controlling and motivating force directing this case, thus, precluding certification.  *Shiring,* 244 F.R.D. at 316 (denying class certification where "plaintiff elected to pursue litigation only after responding to a

---

[3] Mr. Poulikakos conceded that "management doing a poor job of fighting the naked shorting done by hedge funds and misreporting by Melissa Davis of TheStreet.com" did not constitute fraud by the Defendants, Ex. E. at 187-91, and a "fail[ure] to get contracts" clearly is not fraud either.  In any event, as alleged in the Complaint, competitors' erosion of Force Protection's market share had been well known to investors far in advance of the Company's February 2008 restatement announcement, through a series of contract awards to competitors beginning in May 2007.  Compl. ¶¶ 11-12, 95, 133-48, 158, 161, 164.

press release distributed by [plaintiff's counsel] and even then based only on [counsel's] investigation and research"); *Berger,* 257 F.3d at 483.

Even worse than his fellow proposed class representatives, Mr. Jager conceded that even after having joined the lawsuit and filed a complaint accusing the Defendants of defrauding investors, he is unsure whether Defendants are guilty of any misconduct:

> Q:    Do you believe you've suffered harm as a result of the fraud that is alleged in your complaint?
>
> A:    So the vote is out. If it's determined that there was indeed something wrong, then I think I was harmed financially, but I don't know that we've determined that at this point yet.

Ex. G. at 98-99.

The decision that Plaintiffs should join together in seeking lead plaintiff appointment as a group in the first instance was also made by counsel. *See, e.g.,* Ex. A at 56-57; Ex. D at 66; Ex. E at 25-26. Although each proposed class representative executed a declaration stating that he/she had "determined it was in my best interests to join with the other members," none could articulate specifically how his/her interests were better served by joining the group aside from their lawyers' say-so. *See* Ex. A at 58-59; Ex. D at 66; Ex. E at 25-27; Ex. F at 26-28; Ex. G. at 20-22. Where previously unrelated investors are cobbled together at counsel's direction for no apparent purpose other than to amass the largest combined losses, the clear implication is that counsel, rather than the investors themselves are controlling the case. *See Syntax-Brillian*, 2008 WL 942273, at *3. Such groups are not adequate class representatives. *In re Microstrategy*, 110 F. Supp. 2d at 437.

### c.    Plaintiffs have not coordinated to supervise the litigation.

Plaintiffs also have admittedly failed to make good on their assurances to the Court that at least three of the seven Plaintiffs would "jointly participate in conference calls with counsel to

oversee the litigation," and that such calls would be held "at least every quarter."  Docket No. 39-1, ¶ 9.  They now concede that *only two such calls were held during the 20-month period between the time of that statement and the depositions of most of the Lead Plaintiffs in February 2010*.  *See* Ex. E at 68-69, 71-72.[4]  Worse still, Plaintiffs testified that the first call was convened "around the time frame that our law firms decided to join forces," – roughly, May 2008 – and the second call was held shortly before a series of February 2010 depositions.  *See* Ex. E at 74; Ex. A at 63-68.  Thus, during a period of almost two years – during which time:  (1) Plaintiffs filed a consolidated complaint; (2) Plaintiff's counsel (unbeknownst to Plaintiffs) sought to be appointed as lead counsel in the related derivative lawsuit pending before this Court; (3) Defendant's motion to dismiss that complaint was briefed, argued, and decided; (4) discovery began; and (5) Plaintiffs filed their motion for class certification – *there was no coordinated communication whatsoever among the lead plaintiff group*.  As of February 2010, Plaintiffs admittedly had failed to discuss with one another or define any specific plan for coordinating oversight of the case.  *See* Ex. A at 101-102; Ex. E at 81.  Plaintiffs' failure to coordinate to supervise and direct the litigation during this critical period (despite assuring the

_____

[4] In addition, the representation that the members of the group had "conferred with one another regarding the coordination of the prosecution of this litigation" has proven to have been false. None of the other Plaintiffs has ever "conferred" with Ms. Shah about any aspect of the litigation.  *See* Ex. D. at 70; Ex. E at 16, 27-28; Ex. A at 144-45 & 152-54; Ex. F at 14; Ex. G at 31-32.  Nor has George Poulikakos ever conferred with any Plaintiffs other than his son and wife.  Ex. H at 16 & 21.  Even the description of Ms. Shah as a "close family friend" of the Poulikakos family, Docket No. 39 at 9, was inaccurate and misleading.  Panteli Poulikakos testified that he "[does not] know [Ms. Shah] personally," and "would describe her as an acquaintance."  Ex. E at 16; *see also* Ex. I at 9 ("Actually, I don't even know Panteli very well.").  Niki Poulikakos confirmed that the Poulikakoses are "not close friends with [B. Shah]," that she only recognized B. Shah's name because she has "seen it in legal documents," and that she has only spoken with B. Shah once at a wedding "six or seven years ago."  Ex. F at 14-15, 24-25.  George Poulikakos and David Jager likewise did not know Ms. Shah; indeed, neither even knew her gender.  *See* Ex. H at 16; Ex. G at 32.  False representations to the Court are a basis for disqualifying plaintiffs as class representatives.  *Shiring,* 244 F.R.D. at 316-317.

Court that they would do so) attests to their inadequacy as proposed class representatives.  *See Shiring,* 244 F.R.D. at 316; *Shriver,* 2006 U.S. Dist. LEXIS 40607, at *25-27; *In re Network Assocs.,* 76 F. Supp. 2d at 1026.

      As the result of their lack of active engagement in the case, Plaintiffs were uninvolved in various important case developments and decisions.  Although they claim to have reviewed a draft of their Complaint before its filing, not one of the proposed class representatives actively contributed to drafting the Complaint or participated in any factual investigation upon which its allegations are purportedly based.  *See* Ex. A at 79, 81-82; Ex. E. at 51-52; Ex. F at 65; Ex. G at 61; Ex. D at 65.

      Nor were the proposed class representatives consulted in advance of counsel's decision to file a pleading in the related Force Protection derivative litigation pending before this Court.  Ex. A at 91-92; Ex. E at 170-72; Ex. G at 66-67; Ex. D at 72.  Their lack of advance awareness and approval of that filing is shocking, since had counsel's motion seeking appointment as counsel for nominal derivative plaintiffs asserting claims *on behalf of* Force Protection, while simultaneously representing a putative class of investors pursuing claims for monetary damages *against* Force Protection been successful, counsel would have been placed in a conflict of interest.  *See, e.g., In re Cont'l Ill. Sec. Litig.*, 750 F. Supp. 868, 875 (N.D. Ill. 1990), *rev'd on other grounds*, 962 F.2d 566 (7th Cir. 1992) (holding that "that the class would have to be represented by different counsel than those who represented the derivative plaintiff" because "potential conflict of interest existed between the class plaintiffs, who were suing the corporation in their own interest, and the derivative plaintiff, who was suing on behalf of the corporation"); *Koenig v. Benson,* 117 F.R.D. 330, 335 (E.D.N.Y. 1987) ("[I]t is difficult to understand how an attorney can properly represent the interests of a corporation and its present shareholders in a

derivative action brought on their behalf, and, at one and the same time, properly represent its present and/or former shareholders in a class action against the corporation without compromising the independence of professional judgment and loyalty to these two groups of clients with potentially conflicting interests.").  At minimum, Plaintiffs should have been aware of counsel's filing in the derivative case *before* it was filed, been consulted regarding its possible implications, and approved the decision to file in advance of the filing.  *See Krim v. pcOrder.com, Inc.,* 210 F.R.D. 581, 589-90 (W.D. Tex. 2002) (denying class certification and holding that plaintiffs failed to demonstrate counsel's adequacy where counsel failed to disclose *possible* conflicts posed by involvement in multiple class actions against defendant company).

It is likewise extremely troubling that the Chicago Laborers' Fund, Mr. Jager, and Mr. Trautman had no advance notice of or participation in a decision as momentous as that to seek withdrawal of two Plaintiffs – George Poulikakos and Bhadra Shah – as potential class representatives.  *See* Ex. A at 157, 172-175; Ex. G at 67; Ex. D at 72.  Since failure of the remaining Plaintiffs to demonstrate their adequacy as class representatives would result in denial of class certification, all Plaintiffs should have been consulted on and approved in advance the requested withdrawal.[5]

Whatever counsel's other qualifications, counsel's failure to ensure that all Plaintiffs were informed of and approved the derivative litigation and class representative withdrawal filings in advance cast doubt upon their adequacy to represent the class in this case.  However,

---

[5] Having withdrawn as proposed class representatives, neither George Poulikakos nor Bhadra Shah may be found adequate representatives.  In any event, each is plainly inadequate.  Neither controlled investment decisions made on his/her behalf.  *See* Docket No. 153; Ex. H at 10; Ex. I at 8-11.  Mr. Poulikakos admitted that he had done nothing to participate in the case beyond having a few discussions with his wife and son, Ex. H at 10, 12, and he had no understanding of the role of a lead plaintiff or class representative.  *Id.* at 18-20, 22.  Ms. Shah could not articulate even a rudimentary understanding of the claims in this case.  *See* Ex. I at 7 ("My claim is that all my money is gone and that they cheated me. . . .  They misappropriated my money.").

had Plaintiffs actively monitored and supervised counsel as the Reform Act requires rather than passively waiting for counsel to tell them what (in counsel's judgment) they needed to know of developments in the litigation, they would have been positioned to exercise informed judgment and control regarding the filings.  Both counsel's failure to consult with Plaintiffs and Plaintiffs' unawareness of these critical case developments warrant a finding that the adequacy requirement is not satisfied and class certification should be denied.  *See Shiring,* 244 F.R.D. at 316 (denying certification where, *inter alia*, proposed class representative did not participate in preparing complaint, was not sufficiently involved in other key decisions in case, and relied excessively on counsel to manage and direct the case); *Krim,* 210 F.R.D. at 589-90.

### B. The Court Should Deny Class Certification Because The Proposed Class Representatives' Claims Are Atypical.

#### 1. The Presence Of Even Arguable Defenses Unique To The Class Representatives Defeats Typicality.

A proposed class representative who is subject to unique defenses to which other class members would not be subject cannot satisfy Rule 23(a)'s "typicality" requirement.  *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,* 903 F.2d 176, 180 (2d Cir. 1990) (affirming denial of class certification where representative subject to unique defenses as to reliance); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508-09 (9th Cir. 1992) (same); *see also Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 663-64 (D. Or. 1991).  Defendants need not show that they will ultimately prevail on the defenses in order to rebut lead plaintiffs' attempted demonstration as to typicality.  *See Shiring,* 244 F.R.D. at 313. "Instead, the presence of even an *arguable defense* peculiar to the named plaintiff may destroy the required typicality."  *Id.* (citation omitted; emphasis in original); *see also Gary Plastic,* 903 F.2d at 180 (typicality standard not met based on "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it"); *Hanon,* 976 F.2d at 508-09

(same); *Rolex,* 136 F.R.D. at 664. Here, the proposed class representatives are subject to unique defenses due to their: (1) continued purchases of Force Protection stock following disclosures alleged to have revealed prior "fraud" by Defendants; and/or (2) unusual high-frequency trading.

> **2.      Each Proposed Class Representative Continued To Purchase Force Protection Stock Following Disclosures Of The Alleged "Fraud."**

It is well established that a plaintiff who continues to purchase a company's stock *after* public disclosure of the information alleged to have been concealed or misrepresented is subject to unique defenses as to the element of reliance that will defeat class certification. *See, e.g., In re Safeguard Scientifics,* 216 F.R.D. 577, 582 (E.D. Pa. 2003) (plaintiff who increased holdings in issuer's stock after public disclosure of the alleged fraud was barred from representing class); *Gary Plastic,* 903 F.2d at 178, 180 (affirming denial of class certification where lead plaintiff "rolled over" four certificates of deposit *after* learning of "fraud" alleged to have induced initial investment in certificates); *Kovaleff v. Piano,* 142 F.R.D. 406, 408 (S.D.N.Y. 1992) ("because plaintiffs increased their holdings of [issuer's] common stock after disclosure of the alleged fraud, they are subject to such unique defenses that they cannot be deemed to be adequate or typical representatives of the class"); *Rolex,* 136 F.R.D. at 664; *Epstein v. Am. Reserve Corp.,* No. 79 C 4767, 1988 WL 40500, at *4 (N.D. Ill. Apr. 21, 1988).[6] As set forth below, each of the proposed class representatives continued to make substantial investments in Force Protection stock *after* information that Plaintiffs alleged was previously fraudulently concealed or

---

[6] That is so even where, as here, plaintiffs claim that reliance can be presumed under the so-called "fraud-on-the-market" theory. Indeed, in *Basic v. Levinson,* 485 U.S. 224, 242-43 (1988), in which the Supreme Court first recognized the rebuttable fraud-on-the-market presumption of reliance, the Court observed that "if, despite [defendants'] allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded [the issuer's] shares after the corrective statements would have no direct or indirect connection with the fraud" such that any presumption of reliance would be rebutted as to such persons. *Id.* at 248-49; *see also Rolex,* 136 F.R.D. at 664 (fraud-on-the-market reliance presumption was rebutted as to proposed class representative who continued to buy stock after alleged misrepresentations had been corrected).

misrepresented had been disclosed to the market. Each proposed representative is subject to unique defenses on that basis and is, thus, inadequate.

>    a.    **Plaintiffs' allegations confirm that the alleged "fraud" was revealed by no later than November 13, 2007.**

Lead Plaintiffs allege that each of the four categories of "misrepresentations" complained of in the Complaint was corrected during the alleged class period by disclosures allegedly showing the prior challenged statements to have been false or misleading:

>    *Projections regarding future MRAP contract awards*

According to the Complaint, statements that Force Protection had "no reason to believe" that customers would stop buying Force Protection vehicles were proven false by a series of reports of MRAP contracts awarded to Force Protection competitors, starting with a May 30, 2007 announcement that the Department of Defense's ("DoD") had awarded a $623 million contract to Navistar, while awarding Force Protection only a "token" $11.99 million contract. Compl. ¶ 133. Shortly thereafter, Plaintiffs allege a stock analyst "projected that the Company would lose out to rivals for the next set of MRAP orders." *Id*. ¶ 135. In the following months, more MRAP contracts – some awarded to Force Protection and others to competitors – were announced.[7] According to the Complaint, information contained in Force Protection's Form 10-Q for the third quarter of 2007 (on November 13, 2007), caused investors to believe that Force Protection "was no longer receiving new contracts" for its vehicles. Compl. ¶ 161.[8]

---

[7] *See id.* ¶ 138 ($212 million contract awarded to BAE systems; June 28, 2007); ¶ 142 ($518 million contract awarded to BAE systems; July 13, 2007); ¶ 144 ($414 million contract awarded to BAE systems; July 23, 2007); ¶ 148 (General Dynamics awarded 600 MRAP contract; August 8, 2007); ¶ 158 (Navistar awarded 1,000 MRAP contract; BAE Systems awarded 600 MRAP contract; and Force Protection awarded 800 MRAP contract; October 19, 2007).

[8] The Complaint mistakenly alleges that the 10-Q was filed on November 14, 2007. In fact, it was filed after the market closed on November 13, 2007. *See* Docket No. 110-4.

Defendants strenuously disagree that announcements of awards to competitors show the Company's projections to have been false or misleading, particularly in light of the Company's disclosures warning investors of the risks posed by vigorous competition from other defense contractors.  *See* Docket No. 110-5 at 5.[9]   But even accepting, *arguendo,* Plaintiffs' demonstrably untenable claim to that effect, the Complaint itself plainly alleges that any such "misstatements" had been corrected as early as May 30, 2007, and certainly by no later than November 13, 2007, at which time, according to Plaintiffs, investors believed that the Company would not be awarded any further MRAP contracts.  *See* Compl. ¶ 161.

### *Compliance with applicable regulations*

The Complaint also alleges that the Company's third quarter 2007 Form 10-Q – which reported, among other things, that government contracting auditing agencies had issued reports criticizing the Company's finances, accounting systems, and other aspects of its performance under applicable contracting standards – revealed that prior statements of belief that the Company was in compliance with applicable regulations were false and misleading.  *See* Compl. ¶¶ 87, 88, 160.  Plaintiffs cite a June 27, 2007 report by the DoD Inspector General's Office (the "OIG"), which Plaintiffs allege "concluded that Force Protection failed to meet the DoD's Responsible Prospective Contractors General Standards and the FAR definition of an acceptable contractor" and a July 13, 2007 news article carried on Bloomberg discussing an OIG report criticizing the Company for allegedly failing to meet delivery deadlines for some $417 million worth of MRAPs as additional support showing that Force Protection's claims of regulatory compliance were false and misleading.  *See* Compl. ¶¶ 92, 141.  Although Defendants strongly

---

[9] To the contrary, Plaintiffs' allegations regarding the 800 MRAP and $377 million contracts – two of the largest in Company history – awarded to Force Protection in October and December 2007, actually confirm the accuracy of Force Protections' projections that customers would continue buying its vehicles.

dispute that the third-quarter 2007 10-Q or above reports show that the Company's actual statements about regulatory compliance were false or misleading, Plaintiffs' allegations make clear that investors were informed of the allegedly misrepresented information by no later than the release of the 10-Q following the close of trading on November 13, 2007.

*Effectiveness of Internal Controls*

As alleged in the Complaint, the third quarter 2007 Form 10-Q also included a statement that the Company's internal controls were not effective through 2005, 2006, and the third quarter of 2007 due to various "material weaknesses." *See* Compl. ¶¶ 160, 162. The 10-Q stated, in relevant part:

> We have identified material weaknesses in our internal control over financial reporting, which could adversely affect or ability to report our financial condition and results of operations accurately or on a timely basis, and we have concluded that our disclosure controls and procedures were not effective as of December 31, 2005, December 31, 2006, and September 30, 2007.
>
> * * *
>
> [A]s of December 31, 2005, December 31, 2006, and September 30, 2007, we did not maintain effective control over financial reporting. Specifically, the control deficiencies that contributed to our material weaknesses included our lack of a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with our company and training in the application of generally accepted accounting principles, or GAAP, commensurate with our financial reporting requirements.
>
> * * *
>
> Each of our material weaknesses results in more than a remote likelihood that a material misstatement of the annual or interim financial statements that we prepare will not be prevented or detected. As a result, we must perform extensive additional work to obtain reasonable assurance regarding the reliability of our financial statements. Even with this additional work, there is a risk of additional errors not being prevented or detected, which could result in additional restatements. Moreover, other material weaknesses may be identified.
>
> * * *
>
> Material weaknesses in our internal control over financial reporting could adversely impact our ability to provide timely and accurate financial

> information. If we are unsuccessful in implementing or following or
> remediation plan, or fail to update our internal control over financial
> reporting as our business evolves, we may be unable to report financial
> information timely and accurately . . .
>
> * * *
>
> We also have extensive work remaining to remedy the identified material
> weaknesses in our internal control over financial reporting and disclosure
> controls and this work will continue for the balance of 2007 and perhaps
> beyond. There can be no assurance as to when all of the material
> weaknesses will be remedied.

Docket No. 110-4 at 45. Thus, as alleged in the Complaint, and set forth above, the Company's

third quarter 2007 10-Q was an unambiguous "admission that [Force Protection's] internal

controls were unreliable." Compl. ¶ 162. With the filing of the 10-Q following the close of

trading on November 13, 2007, the ineffectiveness and unreliability of the Company's internal

controls through the third quarter of 2007 indisputably had been disclosed to the market.

### *Reported Quarterly Financial Results for 2007*

Although Force Protection's third quarter 2007 10-Q did not state with certainty that the

Company would restate its quarterly financial results for 2007, as quoted above, the 10-Q

explicitly warned investors that, due to the various material weaknesses in the Company's

financial reporting and disclosure controls existing as of the close of the third quarter 2007, there

existed a "more than a remote likelihood" of a "material misstatement" of the Company's annual

and interim financial results. Docket No. 110-4 at 45. The 10-Q also expressly cautioned that,

until the Company completed "extensive additional work" that would "continue for the balance

of 2007 and perhaps beyond" ***there could be no "reasonable assurance regarding the reliability***

***of our financial statements." Id.*** (emphasis added). Following these clear and unambiguous

statements that the Company's internal controls were ineffective to prevent or detect a material

misstatement and that there was no reasonable assurance that the Company's financial statements

were reliable, it became unreasonable, as a matter of law, for investors to rely on those financial statements. *See, e.g., In re Nature's Sunshine Prods., Inc. Sec. Litig.,* 251 F.R.D. 656, 666-67 (D. Utah 2008) (following SEC filing warning investors that financial were unreliable, it became unreasonable as a matter of law for investors to rely on financials).

<div align="center">

**b.    The proposed class representatives continued to buy Force Protection stock following alleged corrective disclosures.**

</div>

Each of the proposed class representatives continued to purchase Force Protection stock following disclosures of information alleged in the Complaint to have revealed elements of the alleged "fraud," thereby subjecting themselves to unique defenses making their claims atypical and rendering them inadequate class representatives. Mr. Trautman, for example, purchased a total of at least of 64,758 shares Force Protection stock – more than 47% of his class period purchases – *after* Force Protection filed its third quarter 2007 10-Q, when, as noted above, there was no longer any basis to claim reliance on statements alleged in the Complaint to have been false or misleading. Ex. J.[10] Trautman's substantial continued purchases of Force Protection stock following the market's discovery of the information alleged to have "revealed" the alleged "fraud" subjects him to unique reliance defenses rendering him unfit as a class representative. *See In re Safeguard,* 216 F.R.D. at 582; *Gary Plastic,* 903 F.2d at 178, 180; *Kovaleff,* 142 F.R.D. at 408; *Rolex,* 136 F.R.D. at 664. The same is true of the Chicago Laborers' Fund – which

---

[10] Mr. Trautman admitted that his stock certification omitted numerous purchases and sales of Force Protection stock made in his "after-tax" trading account, Ex. D. at 21-26, which further supports a finding that he is inadequate as a class representative. *See Shiring,* 244 F.R.D. at 317 (holding that a single error on plaintiff's stock certification rendered him inadequate: "[such] inadvertence or his indifference to the PSLRA's certification requirements demonstrates a lack of diligence and candor that, in conjunction with [] other deficiencies, counsel against a finding of adequacy").

purchased 11,982 shares of Force Protection stock[11] – and Panteli and Niki Poulikakos – who purchased 16,845 and 1,500 shares of Force Protection stock, respectively – after the Company filed its 10-Q for the third quarter of 2007.  Ex. K; Ex. L, Ex. M.

Although Mr. Jager's last purchase of Force Protection stock was made on July 26, 2007, *see* Ex. N, that purchase followed several disclosures of large MRAP contracts awarded to Force Protection competitors. *See supra* at 20.  Mr. Jager's last purchase also came after the June 27, 2007 OIG report allegedly concluding that Force Protection had failed to meet certain contracting standards and the July 13, 2007 Bloomberg article discussing further OIG criticism of the Company for allegedly failing to meet delivery deadlines. *See* Compl. ¶¶ 92, 141.  At minimum, Mr. Jager is subject to unique defenses as to the order projection and regulatory compliance claims.  As such, he too is unfit to represent the proposed class.

> ### 3.    Mr. Trautman's And Panteli Poulikakos's Frequent High-Volume Trades Subject Them To Unique Defenses.

Mr. Trautman and Panteli Poulikakos are also subject to unique defenses due to their unusual, high-frequency trading practices that entailed buying and selling thousands or even tens of thousands of shares of Force Protection stock in short bursts, often within the space of a single trading day. *See* Ex. J; Ex. L.  Courts have refused to appoint investors that "engage[] in transactions far beyond the scope of what a typical investor contemplates," and this Court should find that the trading practices followed by Messrs. Trautman and Poulikakos render them unfit as class representatives. *In re Microstrategy*, 110 F. Supp. 2d at 437.

---

[11] Mr. Capasso admitted that, even knowing all that he does today, he has not instructed the Fund's investment manager, Columbia Partner, not to buy more Force Protection stock.  Ex. A at 194-95. ████████████████████████████████████████████

Mr. Trautman followed an especially peculiar trading pattern of selling 10,000 or more shares of Force Protection stock (often nearly or entirely liquidating his position) and then buying back a roughly equivalent number of shares the same day or the next day. *See* Ex. J. The trades rarely if ever corresponded to announcements of any information (positive or negative) about Force Protection alleged in the Complaint to have been related to the claimed "fraud." For example, Mr. Trautman sold 10,000 shares of Force Protection stock (more than 80% of his position) on September 11, 2007 and then bought 10,075 shares that same day, even though the Complaint does not allege any disclosure of information specific to Force Protection (related to the alleged "fraud" or otherwise) at any time within a month in either direction of September 11, 2007. *See* Ex. J.[12] Such frequent high-volume in-and-out trading, belies any true reliance on company reports – particularly as here where the trades largely fail to correspond to disclosures of company-specific information – or even the integrity of the market price itself, and strongly suggests that Mr. Trautman is subject to unique defenses and not a fit representative for the proposed class. *See Syntax-Brillian*, 2008 WL 942273, at *4 ("Such a high volume day trader might be subject to the unique defense that frantic trading belies any true reliance on company reports or even the integrity of the stock price itself."); *Eichenholtz,* 2008 WL 3925289, at *10-

---

[12] One week later, and again without any apparent connection to the release of Company-related information, he sold 12,490 shares (liquidating his position) on September 18, 2007 and bought back 11,610 shares that same day. *See* Ex. J; *see also id.* (sold 11,000 shares on October 1, 2007, bought back 10,935; sold 12,330 shares on October 10, 2007, bought back 12,150; sold 13,000 shares October 23, 2007, bought back 12,170 shares October 24, 2007, sold 12,170 shares October 30, 2007; sold 15,100 shares December 4, 2007, bought 14,595 shares December 6, 2007; bought 16,963 shares January 29, 2008, sold same shares February 4, 2008). At his deposition, Mr. Trautman testified that he could not recall the particular reason(s) why he made any specific purchase or sale of Force Protection stock. *See* Ex. D at 39-42, 44-51. To the extent he now seeks to assert that his sales of 11,770 shares of Force Protection stock on October 15, 2007 were prompted in whole or in part by the Company's filing of a restated Form 10-K for 2006 after the market close on October 12, 2007, the Complaint mentions no intervening announcement of Company-specific information that would explain Mr. Trautman's decision to re-purchase 13,000 shares on October 16, 2007. *See* Ex. J.

11 (high-frequency trader was subject to unique reliance defenses and thus not typical of class); *In re Safeguard Scientifics*, 216 F.R.D. at 582-83.

Panteli Poulikakos also engaged in frequent high-volume trading that suggests he is subject to unique defenses and cannot satisfy the typicality requirement. *See* Ex. L.  For example, he bought and sold 5,000 shares of Force Protection stock on January 18, 2007, *id.,* a date that does not correspond to any disclosure of information alleged in the Complaint to be related to the alleged "fraud."[13]  Mr. Poulikakos executed many other single-day or similarly short-term in-and-out trades of thousands of shares of Force Protection stock prior to and during the alleged class period that belie true reliance on either the statements challenged in the Complaint as false and misleading, or even the integrity of the market price for Force Protection stock at the times of the trades.  *Id.; see also Syntax-Brillian*, 2008 WL 942273, at \*4; *Eichenholtz,* 2008 WL 3925289, at \*10-11; *In re Safeguard Scientifics*, 216 F.R.D. at 582-83.

In addition, both Messrs. Trautman and Poulikakos admitted that there were times during which they could definitively confirm that their high-frequency, high-volume trades were being executed not because of any specific substantive information about Force Protection, but simply to attempt to profit or recoup losses by timing trades to benefit from volatility in the stock's price.  *See* Ex. D at 51, 58, 34, 38, 46; Ex. E at 103, 108-09.  Such short term trading based on technical stock price movements rather than substantive company information subjects the trader to unique defenses rendering his claims atypical and confirming his unfitness to serve as a class representative.  *See In re Safeguard Scientifics*, 216 F.R.D. at 582.

---

[13] Plaintiffs chose January 18, 2007 as the start of the class period because that is the date on which Force Protection stock first began to be traded on the NASDAQ exchange.  Compl. ¶ 28 n.1.  Plaintiffs concede that the fraud-on-the-market reliance presumption, of which they hope to avail themselves to satisfy Rule 23(b)(3), would not apply prior to that date.  *Id.*

C.    **Plaintiffs Have Failed To Demonstrate Application Of The Fraud-On-The-Market Presumption (Or The Presumption Has Been Rebutted).**

Plaintiffs propose to satisfy their Rule 23(b) burden by attempting to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3); *see also* Pl. Br., pp. 15-25.  However, even setting aside the unique reliance defenses to which the proposed class representatives are subject, Plaintiffs have not demonstrated that *the class itself* may rely on the judicially-created presumption of reliance supplied by the "fraud-on-the-market" theory.  Without the fraud-on-the-market presumption, individual issues of proof as to each class member's reliance on the alleged misrepresentations will predominate, making class certification inappropriate.  *See Gariety,* 368 F.3d at 359, 365 (overturning order certifying securities fraud class where district court relied on "mere assertions" and "allegations" by plaintiff to support plaintiff's contention that reliance could be presumed under the "fraud-on-the-market theory" rather than taking the "close look" and "rigorous analysis" required by Rule 23); *Basic v. Levinson*, 485 U.S. 224, 241-49 (1988).

1.    **Fraud-On-The-Market Presumption Requires A Showing That Alleged Misrepresentations Moved The Market Price Of The Stock.**

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  *Basic,* 485 U.S. at 241.  As the theory goes, an "open and developed securities market" will instantaneously incorporate all available material information into the price of a security.  *Id.*  Any material "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements" since the misstatement will have been reflected in the price the market sets for the stock.  *Id.* at 241-42; *see also Gariety,* 368 F.3d at 367.  Accordingly, the Supreme Court held in *Basic* that securities fraud plaintiffs may trigger a *rebuttable* presumption of reliance (and

thereby satisfy the predominance requirement of Rule 23(b)(3)) if they can demonstrate that:  (1) defendants made public misrepresentations; (2) the misrepresentations were material; (3) the stock at issue traded in an "efficient" market (that rapidly incorporates available material information into the market price of the security); and (4) plaintiffs purchased the security after the misrepresentations were made but before the truth was revealed.  485 U.S. at 248 n.27.  The Court took care to note, however, that the presumption may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Id.* at 248.

"In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of [a] stock."  *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir. 1997); *see also Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir. 2000) (an efficient market's failure to promptly re-price stock upon disclosure of information confirms, as a matter of law, that the information is not material); *No. 84 Employer-teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 948 (9th Cir. 2003) (same). Thus, a demonstration of the materiality required to invoke the presumption entails a showing that the alleged misstatement(s) actually changed the market price of the stock at issue.  *See Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 414 (5th Cir. 2001) ("plaintiff [may] recover under the fraud on the market theory if he [can] prove that the defendant's non-disclosure materially affected the market price of the security").  "If the market price was not *actually* affected by the [allegedly fraudulent] statement, reliance on the market price does not *of itself* become reliance on the statement."  *Id.* at 419 (emphasis in original).  "[I]n such a case, the basis for finding that that fraud had been transmitted through market price would be gone," and the presumption of reliance would, thus, be improper.  *Id.* at 414; *see also America West,* 320 F.3d at 949 ("In fraud-

on-the-market cases, the failure of a stock's price to significantly change following disclosure eliminates the reliance presumption.").

The Fifth Circuit has likened the necessary showing that the alleged misrepresentations actually moved the market price of the stock to the showing required to demonstrate loss causation. *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,* 487 F.3d 261, 265 (5th Cir. 2007); *see also Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 661 (5th Cir. 2004) ("to trigger the presumption [of reliance] plaintiffs must demonstrate that . . . the cause of the decline in stock price is due to the revelation of the truth and not the release of unrelated negative information"); *Fener v. Operating Eng'rs Constr. Indus. and Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 407 (5th Cir. 2009); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,* --- F.3d ----, 2010 WL 481407, at * 2 (5th Cir. 2010).  In essence, a plaintiff must show that (1) negative "truthful" information causing the stock's price to drop is corrective of a prior non-confirmatory alleged misrepresentation or omission; and (2) that it is more probable than not that the corrective statement, and not other, unrelated negative information caused a significant amount of the decline. *See Oscar,* 487 F.3d at 266; *Greenberg,* 364 F.3d at 666.  Consistent with the Supreme Court's articulation of the fraud-on-the-market theory in *Basic*, the rigorous analysis of each Rule 23 factor required at the class certification stage, and Plaintiffs' burden to establish satisfaction of each Rule 23 requirement, the Fifth Circuit has held that plaintiffs must show loss causation "by a preponderance of all admissible evidence" in order to rely on the fraud-on-the-market presumption at class certification. *Oscar,* 487 F.3d at 266-69; *Halliburton,* 2010 WL 481407, at *2.

Plaintiffs argue that this Court ought not to hold them to that standard, citing various cases that criticize the *Oscar* decision as delving more deeply into a "merits" question than is

appropriate at the class certification stage. *See* Pl. Br. at 21-22, n.18. Defendants respectfully submit that the Fourth Circuit is likely to be persuaded by the Fifth Circuit's reasoning, which is well-grounded in the theory underlying the fraud-on-the-market presumption as expressed by the Supreme Court in *Basic*. In addition, the Fifth Circuit's approach plainly owes much to its appreciation of the judiciary's obligation to rigorously scrutinize whether a plaintiff has demonstrated satisfaction of Rule 23's requirements, even where doing so entails consideration of issues that overlap significantly with "merits" issues. *See Oscar* 487 F.3d at 267-69; *Fener,* 579 F.3d at 406. The Fourth Circuit has made clear its commitment to the same principles. *See Gariety,* 368 F.3d at 365-67 (discussing crucial "public function" courts perform in undertaking the required rigorous analysis, including of "merits" issues, needed to make well-supported factual findings regarding satisfaction of Rule 23's standards). For all these reasons, this Court should require a showing, by the preponderance of all admissible evidence, that the alleged misrepresentations materially moved the market price of Force Protection's stock as a prerequisite to finding that Plaintiffs may rely on the fraud-on-the-market presumption to establish a predominance of "common" questions of law and fact concerning the reliance element of their claims.

### 2. Plaintiffs Have Not Demonstrated Application Of The Presumption.

Plaintiffs' failure to show that the alleged misrepresentations materially moved Force Protection's stock price requires denial of class certification. Although they make the "mere assertion" that "it is undisputed that the price of the Company's stock dropped after the revelations identified in the CC," Pl. Br. at 18, lead plaintiffs offer no competent evidence to show that that it is more probable than not that those stock price drops were caused by disclosures of information correcting prior misstatements by Defendants, and not by other negative information not related to the alleged "fraud." Plaintiffs cannot make the required

2:08-cv-00845-CWH    Date Filed 03/31/10    Entry Number 165    Page 37 of 42

demonstration simply by pointing to price declines corresponding to announcements conveying bad news about a company or its prospects. *See Oscar,* 487 F.3d at 271 (requiring quantitative expert analysis providing empirically-based showing that loss can be attributed in significant part to a corrective disclosure as a prerequisite to fraud-on-the-market theory); *Fener,* 579 F.3d at 409 (same); *Halliburton,* 2010 WL 481407, at **3-9. As the Supreme Court has observed, a "tangle of factors," including "changed economic circumstances, changed investor expectations, new industry-specific facts conditions, or other events," affect a stock's price at any given time, and may account in part or whole for observed stock price movements. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 343 (2005). Accordingly, rigorous empirical analysis quantifying the degree to which price moves are caused not by alleged misrepresentations rather than non-"fraud" factors is essential to a demonstration that the fraud-on-the-market presumption applies. *See Oscar,* 487 F.3d at 271; *Fener,* 579 F.3d at 409.

Plaintiffs' promise to supply such analyses later, *see* Pl. Br. at 20, is insufficient. *See Oscar,* 487 F.3d at 271 (quantitative analysis that plaintiff's expert promised to supply at later stage of proceedings was required *before* the Court could conclude fraud-on-the-market reliance presumption applied). Plaintiffs bear the burden to establish satisfaction of all elements needed for class certification by a preponderance of the evidence, and this Court cannot make the required finding that Plaintiffs have done so here in the absence of submitting adequate evidence that the fraud-on-the-market reliance presumption applies. *Gariety,* 368 F.3d at 370.

Plaintiffs' bare-bones chart setting forth four examples which plaintiffs contend illustrate that the alleged fraud caused their investment losses, Pl. Br. at 20-21, serves only to underscore the problems Plaintiffs will face in attempting to establish the required nexus between instances of price declines and the alleged misrepresentations. Two of the examples proffered by Plaintiffs

-32-

purport to show declines in Force Protection's stock price following announcements of MRAP contract awards to competitors on July 23 and August 8, 2007.  *Id.*  Those announcements, however, did not correct any prior misstatement by the Company, because, the Company never claimed that it would never lose orders to competitors; to the contrary, it explicitly warned investors of the vigorous competition to which it was subject and the risks that rivals would begin to take market share.  Docket No. 110-5 at 5, 17.  In any event, to the extent that news of awards to competitors corrected any wishful market perception that Force Protection might dominate the MRAP market to degree that ultimately did not come to pass, that perception was corrected well before the July 23 and August 8, 2007 announcements cited in Plaintiffs' chart. Indeed, as alleged in the Complaint, announcements of large MRAP awards to Force Protection competitors began as early as May 30, 2007.  Compl. ¶ 133.  Such "confirmatory information" reinforcing what the market already knew through prior disclosures "cannot be the basis for a fraud-on-the-market claim."  *Greenberg,* 364 F.3d at 665-66; *see also Oscar,* 487 F.3d at 266.

Plaintiffs' reliance on a stock price drop following the filing of the Company's third quarter 2007 Form 10-Q fails as well.  According to the Complaint, the third quarter 2007 10-Q disclosed adverse reports by the DCAA and TACOM as well as the Company's determination that its internal controls over financial reporting and disclosure were ineffective and plagued by material weaknesses, which plaintiffs alleged revealed to investors elements of the "fraud" alleged to have been committed by Defendants.  *See* Compl. ¶ 160.  However, the Complaint acknowledges that the 10-Q also announced that the Company "needed to raise cash."  *Id.* ¶ 161.[14]  In fact, the 10-Q stated that Force Protection believed, as of the date of the filing, that it

---

[14] Although plaintiffs allege that the need for cash arose because the Company was purportedly "no longer receiving new contracts," that allegation is directly contradicted by the later allegation that the Company received a $377 million MRAP contract the following month.  *Id.* ¶ 164.

had sufficient cash to fund just the next six weeks of operations and had not ruled out additional borrowings or even the issuance of debt or equity securities, including common stock, which in turn would dilute the value of shares held by existing stockholders. *See* Docket No. 110-4 at 38.

The Company's discussion of its dire cash situation and the possible need for dilutive stock issuances was indisputably negative news. It was not, however, *corrective* of any prior statements alleged in the Complaint to have been false or misleading. Where arguably corrective information (such as the disclosure of the DCAA reports and unreliability of the Company's prior financial reports due to internal controls weaknesses) is announced contemporaneously with negative information that is unrelated to the alleged "fraud" (such as Force Protection's need to raise cash and possible share dilution), it is incumbent upon plaintiffs to demonstrate that it is more probable than not that the associated stock price drop was caused by the corrective disclosure rather than the unrelated negative news. *See Fener,* 579 F. 3d at 410; *Oscar,* 487 F.3d at 270. Here, however, Plaintiffs make no effort whatsoever to parse the impact of the allegedly corrective and unrelated information disclosed in the third quarter 2007 10-Q; they simply cite the stock price drop that followed the announcement. Pl. Br. at 21. That is insufficient to demonstrate the application of the fraud-on-the-market presumption. *See Fener,* 579 F.3d at 410; *Oscar,* 487 F.3d at 270.

Finally, Plaintiffs' citation to the drop in Force Protection's stock price following the Company's announcement that it would need to restate its quarterly financial results for 2007 also fails to supply the required showing of a price move caused by the alleged fraud. As discussed *supra* at 22-24, the Company's announcement that it would restate 2007 quarterly results merely confirmed the earlier announcement in the Company's third quarter 10-Q that quarterly results reported for 2007 were not reliable. Such a confirmatory disclosure cannot

supply the required showing of a causal link between the alleged fraud and a decline in price. *See Oscar,* 487 F.3d at 266; *Greenberg,* 364 F.3d at 266.

> **D.    If A Class Is Certified, The Class Period Must End On November 13, 2007.**

If the Court decides to certify a class, it must end with the Company's third quarter 2007 Form 10-Q filing on November 13, 2007.  By that time, all of the information allegedly misrepresented or concealed by Defendants allegedly had also been corrected.  *See supra* at 20-24.  Investors had long since learned that Force Protection's competitors would win a substantial share of the MRAP contracts.  *See* Compl. ¶¶ 11, 91-92, 106, 109, 133-45, 148.  The 10-Q itself disclosed the existence of critical DCAA and TACOM reports, which, together with prior announcements of criticism from the DoD and/or its OIG, form the bases of Plaintiffs' allegations that Defendants misrepresented Force Protection's compliance with applicable regulations.  *See* Compl. ¶¶ 8, 10, 69-75, 87, 91-92, 95.  In addition, the 10-Q stated that the Company's internal controls were ineffective and that its previously reported financial statements were not reliable.  Docket No. 110-4 at 23, 26, 39-40, 43, 45-46.  After these disclosures, any further negative news alleged in the Complaint merely confirmed what the market already knew of Force Protection's competitive prospects, its relationships with regulators, the adequacy of its internal controls and the reliability of its reported financial results. As such, the class period must end with the filing of the November 13, 2007 10-Q.  *See Nature's Sunshine Prods,* 251 F.R.D. at 666-67 (ending class period after disclosure warning investors that Company's financials should not be relied upon); *Greenberg,* 364 F.3d at 665-66 (additional confirmatory disclosures do not support securities fraud claim under fraud-on-the-market theory).

DATED:  March 31, 2010.

*s/ Eleni M. Roumel*
Eleni M. Roumel
Federal Bar No. 9959
NELSON MULLINS RILEY & SCARBOROUGH LLP
151 Meeting Street
Charleston, SC  29401
843.534.4112 (Telephone)
843.534.4223 (Facsimile)
eleni.roumel@nelsonmullins.com


KING & SPALDING LLP
M. Robert Thornton *(admitted pro hac vice)*
Michael R. Smith *(admitted pro hac vice)*
David E. Meadows *(admitted pro hac vice)*
Benjamin Lee *(admitted pro hac vice)*
1180 Peachtree Street N.E.
Atlanta, Georgia  30309
404.572.4600 (Telephone)
404.572.5100 (Facsimile)
bthornton@kslaw.com
mrsmith@kslaw.com
dmeadows@kslaw.com
blee@kslaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2010, I filed the foregoing DEFENDANTS'
MEMORANDUM IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION via the Court's CM/ECF system, which will automatically send electronic
mail notification of such filing to the following attorneys of record:


Brian C. Duffy, *bduffy@duffyandyoung.com*
J. Rutledge Young, III, *ryoung@duffyandyoung.com*
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, SC  29401


Marc I. Gross, *migross@pomlaw.com*
Jeremy A. Lieberman, *jalieberman@pomlaw.com*
Jason S. Cowart, *jscowart@pomlaw.com*
Patrick V. Dahlstrom, *pdahlstrom@pomlaw.com*
POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP
100 Park Avenue
New York, NY  10017


Jeffrey C. Block, *jblock@bermandevalerio.com*
Norman Berman, *nberman@bermandevalerio.com*
Kathleen M. Donovan-Maher, *kdonovanmaher@bermandevalerio.com*
Autumn W. Smith, *asmith@bermandevalerio.com*
BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA  02109

<div style="margin-left:40%;">

*s/ Eleni M. Roumel*
Eleni M. Roumel
Federal Bar No. 9959
NELSON MULLINS RILEY & SCARBOROUGH LLP
151 Meeting Street
Charleston, SC  29401
843.534.4112 (Telephone)
843.534.4223 (Facsimile)
eleni.roumel@nelsonmullins.com


*Attorney for Defendants*

</div>